White v. State—Syllabus.

J. V. WHITE, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

1. Great latitude is to be allowed in the reception of indirect, or circumstantial evidence. It includes all evidence of an indirect nature, whether the inferences afforded by it be drawn from prior experience, or be a deduction of reason from the circumstances of the particular case, or of reason aided by experience. The competency of a collateral fact to be used as the basis of legitimate argument, is not to be determined by the exclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry or to assist, though remotely to a determination probably founded in truth.

2. In a prosecution for murder evidence as to the particulars or merits of a previous difficulty between the defendant and the deceased, not within the issues being tried, is not admissible.

3. Where a homicide is shown and an issue of self-defense is made, evidence is admissible as to the fact of a hostile meeting between the defendant and the deceased shortly before the

fatal encounter, and also as to the apparent feeling of the parties towards each other when they separated, since such circumstances may tend to show the probable attitude of friendliness or hostility of each towards the other when the fatal meeting occurred.

This case was decided by the court En Banc.

Writ of error to the Circuit Court for Jackson County.

The facts in the case are stated in the opinion of the court.

*Price & Lewis, J. W. Kehoe, E. F. Davis* and *Milton Pledger,* for Plaintiff in Error;

*Park Trammell,* Attorney General, *Paul Carter* and *Reeves & Watson,* for the State.

WHITFIELD, C. J.—This writ of error is to a judgment of conviction of murder in the second degree. The homicide occurred on a street at night with no eyewitnesses. The points that will be here discussed relate to the admissibility of circumstantial evidence.

"Great latitude is to be allowed in the reception of indirect or circumstantial evidence. It includes all evidence of an indirect nature, whether the inferences afforded by it be drawn from prior experience, or be a deduction of reason from the circumstances of the particular case, or of reason aided by experience. The competency of a collateral fact to be used as the basis of legitimate argument, is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth."

Mobly v. State, 41 Fla. 621, 26 South. Rep. 732; Reynolds v. State, 52 Fla. 409, 42 South. Rep. 373.

In a prosecution for murder evidence as to the particulars or merits of a previous difficulty between the defendant and the deceased, not within the issues being tried, is not admissible. Sylvester v. State, 46 Fla. 166, 35 South. Rep. 142; 4 Elliott on Ev., Paragraph 3036.

But where a homicide is shown and an issue of self-defense is made, evidence is admissible as to the fact of a hostile meeting between the defendant and the deceased shortly before the fatal encounter, and also as to the apparent feeling of the parties towards each other when they separated, since such circumstances may tend to show the probable attitude of friendliness or hostility of each toward the other when the fatal meeting occurred. See Sylvester v. State, *supra,* 4 Elliott on Ev., Paragraph 3036; 21 Cyc. 894, 915; 21 Am. & Eng. Ency. Law (2nd Ed.) 217; White v. State, 30 Tex. App. 652, 18 S. W. Rep. 462; see also, Lester v. State, 37 Fla. 382, 20 South. Rep. 232.

An issue of self-defense under the plea of not guilty was made when the defendant testified that as he was going home about ten o'clock at night, he unexpectedly saw the deceased approaching him within six or more feet with what he supposed was a weapon in a threatening attitude, after ascertaining it was the defendant and saying "well, we can settle this matter right now, and will settle it right now," whereupon defendant shot deceased five times, the deceased advancing on the defendant in a threatening manner when each shot was fired, and the defendant believing as he fired each shot that his life was in imminent danger. Testimony was admitted of a meeting of the defendant and deceased in the presence of a friend of the defendant, about an hour before the homicide, at which time the defendant struck the deceased once with his fist.

The defendant was then asked "what commenced the altercation between you and him there and caused the blow to pass?" This question was objected to by the State and was properly excluded by the court because it clearly relates to the merits of a previous encounter that was not a part of the *res gestae* and was not within the issues being tried.

The bill of exceptions shows that after the above quoted question was excluded the following proceedings were. had: "Mr. Price: * * * * * * * * We further proffer to prove, in response to the same question, that he, Dr. Alexander, was leaving the office, having been let out of the office by the defendant, and the defendant told Dr. Alexander that it was his purpose to publish him to the people of Marianna publicly the next morning, and that the last thing that Dr. Alexander said before leaving and the last words that he said to the defendant before the meeting just preceding the shooting, was, Jim, for God's sake don't do that; it will ruin me here in Marianna.'

Mr. Kehoe: After having made that proffer and the court having ruled on it, we again except." The same testimony had been offered and excluded and the ruling excepted to before the defendant testified.

Treating the above testimony as having been properly offered, and as having been excluded by the court and an exception noted, its admissibility will be considered.

This proffered testimony does not go to the merits of the altercation at the prior meeting. It does not disclose why the intention to publish was formed, or whether such action was justified; but it tended to show the feeling of the parties towards each other at the close of the previous interview, and was admissible as tending to explain the attitude of each at the fatal meeting as to which the defendant testified. Any circumstances tending "even if a slight degree, to elucidate the inquiry, or to assist, though

remotely, to a determination, probably founded in truth," of the defendant's testimony as to the attitude and action and words of the deceased at the fatal meeting, are admissible under the rule announced by this court as quoted above. This testimony taken with other evidence might be. a basis for legitimate argument favorable to the defendant, the credibility and probative force of it being primarily for the jury to determine. Under the broad rule above quoted and over the defendant's objection the court had admitted testimony that after the first meeting and not in the presence of the defendant, the deceased had asked a person where the friend of defendant, who was at the first encounter, lived; and it was shown that he lived near the place where the homicide occurred. From this the State could urge an inference by the jury that the deceased was at the place of the homicide on a peaceful mission, though he had not often been seen there, and though the defendant lived in the immediate vicinity.

Every circumstance not inherently improper that would tend to prove or to disprove the defendant's testimony of an assault by the deceased that appeared to defendant to endanger his life, is admissible. Although in fact the deceased had only an umbrella in his hand when shot, the defendant is allowed to justify if under all the circumstances he had reason to believe and did believe an assault was made by the deceased with a weapon that endangered his life. These circumstances include the defendant's knowledge of the feeling and attitude of the deceased towards him; and in passing upon the reasonableness of the defendant's belief of his danger, the jury may be informed of the apparent attitude of the deceased towards the defendant at the close of an altercation an hour before. This does not go to the merits of the first encounter. It can not be said that the excluded evidence could not rea-

sonably have affected the verdict under the facts of this case.

For the error indicated the judgment is reversed and a new trial awarded.

TAYLOR, HOCKER and PARKHILL, JJ., concur.

PARKHILL, J., concurring.

I think the judgment of conviction in this case should be reversed because:

1. The court erred in permitting the witness John Justice to testify that, upon the night of the homicide and a short time prior thereto, the deceased, not in the presence of the defendant, asked the witness where Malcolm Stephens lived, and that the witness, not in the presence of the defendant, gave the deceased directions to Malcolm Stephens' home.

2. The court erred in admitting the testimony of George Farley as to what his sister told him the deceased said to her the night of and a short time before the homicide.

3. The court erred in refusing to permit the witness, Malcolm Stephens, to answer the following question propounded by the defendant's counsel: "State whether or not during the conversation there was any personal difficulty between the defendant and Dr. Alexander"—referring to the deceased at a time shortly before the homicide.

4. The court erred in sustaining the objection by the State to the following question propounded by the defendant to the witness Malcolm Stephens: "State whether or not in that conversation, or at any time, there was any statement made by the defendant to Alexander that he

was going to publish him to the people of Marianna for making the assault upon his wife,"—this being the night of the homicide and a short time prior thereto.

HOCKER, J., concurs in the above.

TAYLOR, J., concurs in the above.

COCKRELL, J., dissenting.

The only assignment of error which the majority opinion sustains is based upon the refusal of the court to admit evidence in response to a question admittedly improper. In this I cannot concur. The relevance of the testimony is not so obvious, nor does the record as a whole, in my opinion, make such a case as to justify this court in overruling the well established rule that a proper question must first be asked before the party is entitled to elicit evidence in response thereto.

SHACKLEFORD, J., dissenting.

My judicial associates have been unable to concur in the opinion which I have prepared in this case and have reached the conclusion that the judgment should be reversed. I have decided to file the opinion as originally prepared as a dissenting opinion, making only the necessary changes therein.

At the Spring term, 1909, of the Circuit Court for Jackson County, the plaintiff in error, James V. White, (hereinafter referred to as defendant), was indicted for murder in the first degree, was tried at the same term, convicted of murder in the second degree, and seeks relief here by writ of error.

I find myself confronted with a transcript of the record

containing 347 typewritten pages, 103 assignments of error covering 22 typewritten pages, and voluminous briefs. We have several times had occasion to express our disapproval of the practice of assigning an unnecessary large number of errors. See Hoopes v. Crane, 56 Fla. 395, 47 South. Rep. 992, and authorities there cited. In the cited case we said, "That any one of the Circuit Judges in this State would commit sixty-one separate and distinct errors in the trial of a cause is rather a violent presumption, to say the least of it. Even if such should be the case, it would hardly be necessary to assign every one of such errors in order to secure a reversal from this court." Yet in the instant case we are asked to believe that 103 errors were committed. It is true that all of them are not argued before us, but most of them are. I now feel called upon to emphasize my disapproval of such practice. I would like to impress upon the members of the bar, if I may be so fortunate as to succeed in so doing, that I consider the practice unfair to the court, unfair to the plaintiff in error and unfair to other litigants. If persisted in, I think we shall be forced to frame and adopt a rule regulating the matter, as has been done by the Supreme Court of Michigan and some of the other appellate courts. I would again like to call attention to the forceful language of Mr. Justice COBB in Kelly v. Strouse, 116 Ga. 872, text 899, 43 S. E. Rep. 280, that "Courts of last resort are human beings," which we quoted with approval in Atlantic Coast Line R. R. Co. v. Beazley, 54 Fla. 311 text 391, 45 South. Rep. 761, text 787. I also fully approve of what is said by this learned jurist as to the duties devolving upon members of appellate courts and the fact that they "are liable to make mistakes both in rulings and reasoning, and unguarded and ill-considered expressions are as apt to eminate from them as others." This must necessarily be so from the

fact that they are human beings, therefore not infallible but subject to like infirmities, weaknessess and defects as other men. This being true, members of the bar as officers of the court should render them all the assistance in their power in properly discharging their arduous duties and should be careful not to impose unnecessary burdens upon them. Squarely in line with our holdings upon the point under consideration, I would refer to the following authorities, with the suggestion that they will be found profitable and instructive: Lockard v. Van Alstyne, 155 Mich. 507, 120 N. W. Rep. 1; Finch v. Karste, 97 Mich. 20, 56 N. W. Rep. 123; Fowler v. Gilbert, 38 Mich. 292; Brewster v. Baxter, 2 Wash. Ter. 135, 3 Pac. Rep. 844; Dime Savings Institution v. Allentown Bank, 65 Pa. St. 116, text 123. In the last cited case, Mr. Justice AGNEW, referring to "indiscriminate allegations of error and useless discussions," has well said: "They distract our minds by diverting them to consider matters of no moment, and weaken the strong points, if any, by heaping upon them those that are feeble. Upon a writ of error it is much better to consider well the positions which seem to be fairly tenable, and to present them alone. Then the argument spends its concentrated force upon that which commands consideration, and the attention of the judges is not diverted to that which is immaterial. In this way real error is apt to be detected; while in the other, the mind, wearied by unimportant exceptions and inconclusive discussions, is more likely to overlook material errors. I commend these remarks to those who practice before us." So, in Fowler v. Gilbert, *supra,* it was said: "Whatever may be the necessity of saving points in the hurry of a trial, there can be no such necessity after the interval of reflection occupied in preparing exceptions and maturing the case for argument. No assignments should be fairly made unless counsel has at least some plausible ground

for insisting upon them." I would also call attention
again to the language used by Mr. Justice BREWER in
Fidelity and Deposit Company v. L. Bucki & Son Lumber
Company, 189 U. S. 135, text 138, 23 Sup. Ct. Rep. 582,
which we quoted in Seaboard Air Line R. Co. v. Scarbor-
ough, 52 Fla. 425, text 432, 42 South. Rep. 706, text 708,
and approvingly referred to in Atlantic Coast Line R. R.
Co. v. Crosby, 53 Fla. 400, text 476, 43 South Rep. 318, text
341, which language was as follows: "It may be true,
as the Scriptures have it, that 'in the multitude of coun-
selors there is safety,' but it is also true that in a mul-
titude of assignments of error there is danger." From
what has already been said it will be seen that there is
much truth in this statement. The experience of the
writer hereof has been that wherever an unusually large
number of errors have been assigned, as a general rule,
an examination of them has disclosed the fact that there
is but little, if any, real merit in any of them, so that he
has come to view a large array of assignments with sus-
picion and distrust. We have pointed out the function
or primary object of a writ of error. Hoopes v. Crane,
56 Fla. 395, text 421, 47 South. Rep. 992, text 1001, and
authorities there cited. So we have frequently had oc-
casion to discuss the proper course to pursue in preparing
assignments of error. Williams v. State, 58 Fla. 138, 50
South. Rep. 749, and other cases cited therein. I would
add that it was never intended that assignments of error
should be made to "operate a drag-net," to quote the words
used in Chicago, R. I. & P. R. R. Co. v. Moffit, 75 Ill. 524,
text 529, or to be fired at the appellate court in the nature
of a "broad-side challenge" to the various and sundry
rulings of the trial court, if we may be permitted to bor-
row the forceful expression from State v. Frizell, 111
N. C. 722, 16 S. E. Rep. 409. I would also refer to 2 Ency.
of Pl. & Pr., 921, 940, and authorities cited in notes. I

have taken the time in this case to dwell somewhat at length upon the question of a multiplicity of assignments and to collect authorities bearing thereon, hoping that the members of the bar will heed my admonitions, that I shall not have occasion to advert to the matter again, and that I shall be saved the labor in the future.

I must respectfully but firmly decline the invitation of the defendant to discuss in detail all the assignments which are urged before us. To do so would almost require the writing of a legal treatise upon homicide, which we could hardly be expected to compass in one opinion. See Southern Home Insurance Co. v. Putnal, 57 Fla., 199, 49 South. Rep. 922, text 933, and Pensacola Electric Co. v. Bissett, decided here at the present term. All points made will be considered and those meriting it will be discussed. A number of other cases stand on our docket for disposition that are entitled to their due and proportionate share of the time and attention of the court, with as little delay as may be.

The first assignment is based upon the overruling of the defendant's motion for a change of venue. This may be briefly disposed of. A large number of affidavits were submitted both in behalf of and in opposition to the motion. It was clearly made to appear to the trial judge, even if he could not have taken judicial notice of the fact, that Jackson County was a large county, containing a population of about 30,000 people, of which about 6,000 are qualified for jury duty, such population being largely rural in its nature. The affidavits so submitted were very conflicting in the opinions expressed therein as to whether or not a fair and impartial jury could be obtained in such county for the trial of the defendant. With such a condition of affairs existing, the trial judge evidently thought it advisable to exercise the judicial discretion vested in him by law, and put the matter to a

test, thereby applying in a practical way the well-known proverb, "You never can tell till you try." The result would seem to have justified the wisdom of this course, for, so far as the transcript of the record discloses to us, a fair and impartial jury was obtained for such a trial. Section 3997 of the General Statutes of 1906 expressly provides that "whenever it shall be made to appear to the satisfaction of the presiding judge of any of the Circuit Courts of this State that the venue of any cause, then pending in such courts, should be changed," for any of the reasons therein stated, "it shall be in the power and discretion of such judge to change the venue of such case." An appellate court should not interfere with the exercise of this discretion so vested in the Circuit Judge, unless a plain and palpable abuse thereof is made to appear. See Garcia v. State, 34 Fla., 311, 16 South Rep., 223; Shiver v. State, 41 Fla., 630, 27 South Rep., 36; McNealy v. State, 17 Fla., 198; Irvin v. State, 19 Fla., 872; Adams v. State, 28 Fla., 511, 10 South. Rep. 106; Leslie v. State, 35 Fla., 171, 17 South Rep., 555. The rule is the same in civil as in criminal cases, but we have cited only criminal cases. The discussion of the statute in O'Berry v. State, 47 Fla., 75, 36 South Rep., 440, may also prove of service. No abuse of discretion having been made to appear, I think that this assignment must fail.

The third to the eighth assignments inclusive, and the tenth and eleventh assignments are based upon the sustaining or overruling challenges for cause to certain proposed jurors, or upon matters connected with the examination of jurors upon their voir dire. Suffice it to say that an examination of these assignments and of the defendant's brief in support thereof discloses no reversible error to me. I am not informed by the transcript by what jurors he was tried, though there is a recitation to the effect that "there being twelve men in the jury box

which had been accepted by the State, the said jury was tendered to the defendant, and the defendant having exhausted his peremptory challenges, was forced to accept the same jury to try the said cause." I am not informed at what stage of the trial the defendant's peremptory challenges were exhausted, neither does it affirmatively appear that any objectionable or obnoxious jurors were forced upon him. See Montague v. State, 17 Fla., 662; Andrews v. State, 21 Fla., 598; Denham v. State, 22 Fla., 664; Green v. State, 40 Fla., 191, 23 South. Rep., 851; Peadon v. State, 46 Fla., 124, 35 South. Rep.. 204; Leaptrot v. State, 51 Fla., 57, 40 South. Rep., 616. As we held in Colson v. State, 51 Fla., 19, 40 South. Rep., 183, "A defendant as a matter of right is not entitled to have any particular jurors empanelled to try his case. The right of peremptory challenge is a right to *reject* and not a right to *select.*" This was approved and followed in Melbourne v. State, 51 Fla., 69, 40 South. Rep., 189. We have repeatedly held that it is the duty of a party resorting to an appellate court to make the errors complained of clearly to appear, if they in truth exist; every presumption being in favor of the correctness of the rulings of the trial court. Putnal v. State, 56 Fla., 86, 47 South. Rep., 864, and authorities there cited. This would seem to apply with peculiar force to an assignment based upon ruling on a point resting within the discretion of the trial judge. All facts necessary to show a clear abuse of discretion to the injury of the plaintiff in error must be presented, and wherever the record is either silent or uncertain on any point material to establish such an abuse, the presumptions are all in favor of the correctness of the ruling of which complaint is made. See Ballard v. State, 31 Fla., 266, 12 South. Rep., 865, and authorities therein cited. For the reasons already set forth I

5—Vol. 59.

think it necessarily follows that these several assignments have not been sustained.

The fifteenth assignment is based upon the refusal of the court to permit E. J. Schell, one of the witnesses introduced on behalf of the State, to answer on cross-examination the question, "You were sworn to tell the truth and the whole truth." I find that upon the propounding of this question the court stated, "That is not a proper way to interrogate the witness; you need not answer the question." The exception noted to this statement of the court forms the predicate for this assignment. The witness had previously stated that he had testified at the preliminary trial of the defendant but had not stated at such trial that he had seen any of the flashes when the pistol was fired by the defendant, that he had answered the questions propounded to him. Thereupon this question was asked. Its relevancy and materiality have not been made to appear to us. We do not think that the two authorities cited by the defendant, Jacksonville, T. & K. W. Ry. Co. v. Wellman, 26 Fla., 344, 7 South. Rep., 845, and Wallace v. State, 41 Fla., 547, 26 South. Rep., 713, are in point. As we held in Wilson v. Johnson, 51 Fla., 370, 41 South. Rep., 395, courts of justice exists for the administration and furtherance of justice and in the conduct of trials generally must be left to the discretion of the trial judge. This principle was followed and applied in Adams v. State, 55 Fla., 1, 46 South. Rep., 152. So, in Mathis v. State, 45 Fla., 46, 34 South. Rep., 287, we held that it is within the sound judicial discretion of the trial court to control the detailed examination of witnesses, and, unless an abuse of this judicial discretion is shown, an appellate court will not disturb the ruling made concerning the same. In the light of these authorities, as well as of those previously cited, I think that this assignment fails.

The same witness was also asked on cross-examination, after it had been elicited from him by the defendant that a detective from New York had been to see him and since the preliminary trial and was with him for about five or ten minutes, "Now didn't he tell you that money was no object?" An objection was interposed and sustained, which ruling is made the basis for the sixteenth assignment. I fail to see the pertinency or relevancy of this question. What I have said in treating the fifteenth assignment is sufficient to dispose of this one adversely to the contention of the defendant. I would also refer to Wallace v. State, 41 Fla., 547, 26 South. Rep., 713; Adkinson v. State, 48 Fla., 1, 37 South. Rep., 522; Baker v. State, 51 Fla., 1, 40 South. Rep., 673. The statement of the defendant's counsel that they expected to prove that such detective told the witness that money was no object in getting up testimony in the case of itself does not make the question a proper one.

The twentieth assignment has its basis in the overruling of an objection made by the defendant to a question propounded to A. W. Calhoun, a witness for the State. After he had testified that he was a member of the coroner's jury which had investigated how and in what manner and by whom the deceased came to his death and that the defendant had appeared before the jury and made a statement, he was asked, "Did you hear him say anything about who killed Dr. Alexander?" The ground of the objection was that such evidence was stenographically reported and that such report constituted the best evidence. It seems sufficient to say that the question was a preliminary one and therefore not open to objection. Ortiz v. State, 30, Fla., 256, 11 South. Rep., 611; Dickens v. State, 50 Fla., 17, 38 South. Rep. 909; Atlantic Coast Line R. R. Co. v. Crosby, 53 Fla., 400, text 444, 43 South. Rep., 318, text 331; Golden v. State, 54 Fla., 43, 44 South.

Rep., 948; Gainesville & Gulf R. R. Co. v. Peck, 55 Fla., 402, 46 South. Rep., 1019. The case of Golden v. State, *supra,* will be found to be especially in point. The twenty-first assignment must also fall for like reasons, being based upon the sustaining of an objection to a preliminary objection. The twenty-second and twenty-third assignments are also founded upon the sustaining of objections to questions propounded by the defendant on cross-examination of the same witness. Such questions sought to elicit certain declarations made by the defendant in his statement before the coroner's jury. No error is made to appear here. They do not appear to be in cross of anything brought out on the direct examination, nor do I see wherein the answers thereto would have been competent or proper testimony. The declarations or statements of the defendant so sought to be introduced were clearly of the nature of self-serving declarations, which we have several times held to be inadmissible. Fields v. State, 46 Fla., 84, 35 South. Rep., 185; Thomas v. State, 47 Fla., 99, 36 South. Rep., 161; West v. State, 53 Fla., 77 South. Rep. 445; Jenkins v. State, 58 Fla. 62, 50 South. Rep., 582. The twenty-fourth assignment is based upon the sustaining of an objection to the following question propounded to Fred Watson, a State witness: "Did you make an affidavit in this case on the change of venue proposition?" There was no error in this ruling. It was not in cross of anything brought out on the direct examination and would not in itself tend to show any animus or bias upon the part of the witness. He might well have made an affidavit to the effect that in his opinion a fair and impartial jury could be obtained in that county for the trial of the defendant without having any feeling or animus toward the defendant whatever.

The twenty-sixth assignment is to the effect that the court erred in permitting J. B. Justiss, a State witness,

to testify concerning certain conversations between himself and the deceased. While the bill of exceptions shows that the defendant excepted to the calling of this witness to the stand, and also shows that the defendant objected to certain questions propounded to the witness, it does not disclose that the defendant excepted to the court's ruling on the objection, therefore this assignment is not before us for consideration. Caldwell v. State, 50 Fla., 4, 39 South. Rep., 188, and authorities there cited; Maloy v. State, 52 Fla., 101, 41 South. Rep., 791. After this witness had been examined and cross-examined, the defendant moved to strike out his testimony with reference to his conversation with the deceased, which motion was denied by the court, and which ruling forms the basis for the twenty-seventh assignment. Suffice it to say that the substance of the testimony of this witness, on the direct examination, was that, on the night of the tragedy, the deceased was attending an entertainment, at which the witness sat by him, saw him go out and come back, after which he had a talk with him, and also had a word with him after the entertainment. Then the witness stated, "he (meaning deceased) asked me the way to Malcolm Stephen's house. I directed him." On cross-examination, the witness testified: "There was nothing said about the defendant, White. He was not present. Dr. Alexander did not say he was going to Malcolm Stephens', he only asked where he lived. He expressed no purpose of going there that night. He expressed no intention of going or reason why he wanted to go, or no reason for wanting to know where Mr. Stephens lived. He stated nothing about the defendant White in that conversation." Then came the defendant's motion to strike out all this testimony about the conversation. The defendant has not pointed out to us wherein this testimony was harmful to the defendant in any way and has cited

no authorities in support of his contention. As I do not
see wherein any reversible error was committed either
in admitting this testimony or in refusing the motion
to strike it out, I shall consume no further time in dis-
cussing the matter. See Wooldridge v. State, 49 Fla.,
137, text 153, 38 South. Rep., 3, text 8. We would also
refer to the discussion in Weightnovel v. State, 46 Fla.,
1, 35 South. Rep., 856.

The twenty-eighth assignment is to the effect that the
court erred in permitting George Farley to testify, over
the objection of the defendant, as to a conversation be-
tween his sister and the deceased upon the night of the
tragedy, the defendant not being present, while the refusal
of the motion to strike out such testimony constitutes the
basis for the twenty-ninth assignment. Assuming that
error was committed in these rulings, it was rectified,
later in the trial, by the court of its own motion fully and
clearly directing and instructing the jury that such tes-
timony was withdrawn from their consideration and that
they were to disregard it. This disposes of these two as-
signments.

Malcolm Stephens, a witness called in behalf of the
defendant, testified that the defendant lived right in front
of him at the time of the tragedy, that he and the defend-
ant came up town together on the night the homicide
occurred, that he saw the deceased for the first time that
night at the school-house, that the defendant and the de-
ceased came together to the court-house and went in the
Sheriff's office, as also did the witness, where a conversa-
tion took place between the defendant and the deceased,
which the witness heard. He was first asked to "state
what occurred and what was said between them at that
time." The State interposed an objection and the court
ruled that the question was too broad. The witness then
proceeded to testify that the first thing which transpired

after they had entered the office was that the defendant said to him and the deceased, "Have a seat," and then pulled off his hat and hung it on the rack. The witness began to state what the defendant said to the deceased, when the State again interposed an objection, but no ruling seems to have been made thereon. The witness then testified that he heard the shooting that night, which took place "just about an hour" after they were at the court-house. The following question was then propounded to the witness: "What was it Jim said to Dr. Alexander when they were first seated?" The thirteenth assignment is based upon the sustaining of an objection by the court to this question. Prior to the propounding thereof, a colloquy had taken place between one of defendant's counsel and the court, in the course of which the court had made the following statement: "It does not follow that everything that transpired must come in to explain the conduct of one or the other. If the defendant claims to have acted in self-defense, we will say for argument that he must justify that claim by occurrences that are a part of the res gestae, or by threats, or the equivalent of threats, either made in his presence by the deceased, or communicated to him as coming from the deceased. There might be a hundred and one other transactions between them that would have no bearing on the situation. Therefore, nothing should go to the jury except that which is relevant to the case. Unless it can be shown there was some relevancy in the conversation, the objection will be sustained."

I think that the trial judge was correct in this statement. The defendant's counsel then began to state to the court what he expected to prove by the witness, when, upon the suggestion of the State's counsel, the court directed that the jury retire from the court-room. To this direction the defendant excepted and has assigned error

thereon, forming the thirty-first. Other assignments are based upon similar directions for the withdrawal of the jury given at different stages of the trial. I dispose of them all by stating that this is a matter which must necessarily rest within the discretion of the trial judge, and, unless an abuse thereof is clearly made to appear, an appellate court will not interfere with such rulings. See authorities cited herein in my discussion of the fifteenth assignment.

As quite a number of assignments are based upon the sustaining of objections to questions propounded to this witness and still other assignments are of like nature, I think it advisable to copy from the bill of exceptions all the proceedings from the time of the withdrawal of the jury, of which I have just spoken, up to the close of the testimony of this witness. Such proceedings are as follows:

"In the absence of the jury counsel for the defendant made the following proffer: Mr. Price: Now then, may it please the court, we proffer to prove by this witness, in answer to the question propounded to him, that the defendant stated to Dr. Alexander, 'Dr., this is a very serious matter I have to talk to you about tonight. Judge Liddon: We object on the grounds it is irrelevant and immaterial. The Court: Objection will be sustained. Mr. Price: Your Honor will note an exception. Mr. Wilson: We object on the further ground that it is a self-serving declaration. The Court: Go ahead and make your proffer of what you propose to prove by this witness. Mr. Price: The next question I expect to ask in the presence of the jury. The Court: You cannot have the jury trot in and out. Mr. Price: We think the jury should be present. The Court: Go ahead and make your proffer of testimony and close the whole thing up. I will state that it would appear not within the rights of any party

to attempt to get before the jury something that the court decides should not go before them. That could be the only object of the counsel's procedure. Mr. Price: We object to that remark of the court, for the reason it is calculated to prejudice the rights of the defendant. The Court: No remark made out of the hearing of the jury is calculated to prejudice the jury; nothing out of the presence of the jury is calculated to prejudice anybody. Mr. Price: We except to that remark of the court. The Court: I don't think you can take exceptions to anything outside of the presence of the jury. Q. Did Mr. White state to Dr. Alexander what he wanted to see him about? Judge Liddon: We object to all matters of conversation and what transpired in the Sheriff's office. The Court: I understand that the objection extends through the whole transaction, and I think it is good as to the whole transaction. Mr. Price: Defendant excepts. We offer to show by this witness at this time that the defendant, White, stated to the Dr. that he was informed by his wife that the Doctor had made an assault upon her that morning by putting his arms around her and kissing her while in his dental office as a patient of Dr. Alexander, and while she was in the chair in the dental office; that he also stated to the Doctor at that time that immediately after the assault made by Doctor Alexander upon his wife, that his wife left the office in indignation and that he had just been informed by his wife of such assault. Judge Liddon: We make the same objection. The Court: Objection sustained. Mr. Price: Defendant excepts. Q. State whether or not Dr. Alexander at that time admitted to Jim White that he had made that assault. Judge Liddon: We object. The Court: Objection sustained. Mr. Price: The defendant excepts, and we proffer to prove by this witness that when Dr. Alexander was brought face to face with White, and the statement

made to him that White had been informed by his wife that Alexander then and there admitted that he made the assault on his wife as claimed by her, and told to the defendant by the defendant's wife. Judge Liddon: We make the same objection. The Court: The objection is sustained.     Defendant excepts.     Mr. Price:     State whether or not at that time Dr. Alexander offered any apology or excuse as to why he assaulted the wife of the defendant. Judge Liddon: We make the same objection. Mr. Price: The defendant excepts. We proffer to prove by this witness that Dr. Alexander stated at that time that he could not say to save his life why he had made the assault upon the wife of the defendant, and further stated, 'you know we are all men, we have our passions,' and that was the only reason he could give for doing as he had done, and he offered that as a palliation of his offense of making the assault upon the wife of the defendant and kissing her in his office while there as a patient. Judge Liddon: We object on the same grounds. The Court: The objection is sustained. Mr. Price: The defendant excepts. Mr. Wilson: We object upon the further ground that there is no predicate at this stage of the case for such testimony. Mr. Price: State whether at that time Alexander promised he would never be guilty of the same offense as against the wife of the defendant. Judge Liddon: We object on the same ground. The Court: The objection is sustained. Mr. Price: The defendant excepts. We offer to prove by this witness that at that time Dr. Alexander stated to the defendant that if he would forgive him at this time he would not ever be guilty of a like offense. Judge Liddon: We object on the same grounds. Mr. Price: The defendant excepts. Q. State whether or not you had any conversation with Dr. Alexander at that time about what he had done towards the wife of the defendant. Judge Liddon: We object on the

same grounds. The Court: The objection is sustained. Mr. Price: The defendant excepts. We expect to prove in answer to that question, by this witness, that he asked him, 'Doctor, how in the name of God did you come to do this,' and that the Doctor told the witness that to save his life he could not explain; that he was a human being, a man, and had passions similar to other men, and that was the only explanation he could offer; that he was ashamed of his actions and that he would not ever be guilty of it again; and that he further stated, 'For the soul of me, I can't tell why I did this, it was one of those human weaknesses.' Judge Liddon: We object on the same ground. The Court: The objection is sustained. Mr. Price: The defendant excepts. Q. State whether or not during the conversation there was any personal diffi- culty between the defendant and Dr. Alexander. Judge Liddon: We object on the same grounds. The Court: The objection is sustained. Mr. Price: The defendant excepts. We proffer to prove by this witness in answer to this question that at that time there was a personal difficulty between the defendant and Dr. Alexander and that in the difficulty the defendant struck Alexander one or two licks with his hand; that they were then separated by the witness. Judge Liddon: We object on the same ground. The Court: The objection is sustained. Mr. Price: The defendant excepts. Q. State whether or not in the room at the time spoken of, if you know, Jim White had a pistol on his person. Judge Reeves: We object on the same ground. The Court: The objection is sustained. Mr. Price: The defendant excepts. In answer to the above question we proffer to prove by this witness that during the altercation in the room that Jim White had a pistol in his pocket. Judge Liddon: We make the same objection. Mr. Price: The defendant ex- cepts. Q. State whether or not at that time White made

any offer or attempt to draw that pistol and present it on Alexander or shoot Alexander or to throw any weapon in his face. Judge Liddon: We object on the same ground. The Court: The objection is sustained. Mr. Price: The defendant excepts. We proffer to prove by this witness, in answer to this question, that at that time White had a pistol in his pocket; that he simply struck at the deceased with his fists, made no effort or demonstration to draw that pistol upon Alexander. Judge Liddon: We object on the same grounds. The Court: The objection is sustained. Mr. Price: The defendant excepts. Q. State how long Dr. Alexander then remained in the office. Judge Liddon: We object on the same ground. Mr. Price: The defendant excepts. We proffer to prove by this witness that immediately after the difficulty Dr. Alexander stated that he wanted to go back to the school house and then the defendant got up and opened the door and permitted him to leave; that the deceased then left for the school house so far as the witness was able to see. Judge Liddon: We make the same objection. The Court: The objection is sustained. Mr. Price: The defendant excepts. Q. State whether or not in that conversation, or at any time there, any statement was made by the defendant to Alexander that he was going to publish him to the people of Marianna for making an assault upon his wife, the next day? Judge Liddon: We object. The Court: The objection is sustained. Mr. Price: The defendant excepts. We proffer to prove by this witness that when Alexander left the defendant told him, 'Doctor, I am more surprised at you than any man I know of; I would have suspected any other man in town to have made this assault before I would have expected you. I can't afford, since you have made this assault, for you to remain in the town of Marianna, and I shall publish this action to the people of

Marianna to let them know the character of man you are to make assaults upon women who visit your office for dental purposes.' Judge Liddon: We object on the same grounds. The Court: The objection is sustained. Mr. Price: The defendant excepts. Q. State whether or not the deceased, Alexander, begged the defendant at that time not to publish him for the assault he had made? Judge Liddon: We object on the same grounds. The Court: The objection is sustained. Mr. Price: The defendant excepts. We proffer to prove that Alexander said, 'For the love of God, Jim, don't publish me in the town of Marianna; it will ruin me and I cannot afford to have it done; I have tried to live right; I have been living here in town a long time and I don't want this thing to come out.' Judge Liddon: We object on the same ground. The Court: Objection sustained. Mr. Price: Defendant excepts. Q. State whether or not in that conversation, or any part of it, there was any agreement or understanding between the defendant and Dr. Alexander that they were to meet and discuss this matter later; Judge Liddon: We object on the same ground. The Court: Objection sustained. Mr. Price: Defendant excepts. We proffer to prove in answer to this question that there was no agreement or understanding between the defendant, Jim White, and Dr. Alexander to meet any subsequent time to talk the matter over, or to take any further action between themselves with reference thereto. Q. State whether or not there was any agreement or understanding between you and Dr. Alexander that he was to go to your house or to see you or consult with you on the night of the homicide after leaving the court-house? Judge Liddon: I suppose that would be in the same shape. The Court: Yes. Mr. Price: Do you object to it? Mr. Wilson: Yes, but the court has overruled our objection. Q. State whether or not there was any engagement of any kind whatever be-

tween yourself and Dr. Alexander for a meeting that night? Judge Liddon: Same objection. The Court: Objection sustained. Mr. Price: Defendant excepts. Q. State whether or not there was an engagement or understanding between Jim White and the deceased entered into while you were present as to any subsequent meeting or conversation. The Court: You have asked that once. Mr. Price: It is a different question. Judge Liddon: Same objection. The Court: Objection sustained. Mr. Price: Defendant excepts. Q. State whether or not you saw Alexander any more that night until after the homicide. The Court: I think that is a proper question. Mr. Kehoe: We now ask leave of the court to propound to the witness in the presence of the jury, and permit the witness to answer in the presence of the jury, each of the questions propounded during the absence of the jury, in the court's discretion. The Court: There are certain questions which can be asked. Mr. Price: This applies to each and every question. The Court: The motion is overruled. Mr. Price: Defendant excepts. We now ask the court to indicate to us each of the questions he will permit us to ask the witness in the presence of the jury. Mr. Kehoe: We will endeavor to propound those questions, if the court will permit us. At this point the reporter was requested to read the questions propounded in the absence of the jury, and which the court had ruled were admissible. The jury return to the box. The Court: The stenographer can read the questions. Q. State whether or not there was any agreement or understanding between you and Dr. Alexander that he was to go to your house or to see you or consult with you on the night of the homicide after leaving the court house. A. No, there wasn't. Q. State whether or not there was an engagement or understanding between Jim White and the deceased entered into while you were present as to any subsequent meeting or conversation?

A. No, there was not any engagement made; Jim told me it wasn't necessary to go down. Q. State whether or not you saw Dr. Alexander any more that night until after the homicide? A. No ma'am, I didn't. The reporter having read the questions and the witness having answered them, the counsel then asked the following questions: Q. Now you say that Jim White told the deceased it wasn't necessary to come down to his house? A. I did. Q. For what purpose was he coming down there? A. He offered to come down there to apologize to his wife. Judge Liddon: We object on the same grounds. The Court: Objection sustained. Mr. Price: Defendant excepts. We proffer to prove by this witness ———. Judge Liddon: We object to his stating what he proffers to prove in the presence of the jury. The Court: The jury will have to retire. Mr. Price: Your Honor will note an exception. We proffer to prove by this witness, in answer to that question, that Alexander offered to come down to White's house and get down on his knees and beg Mrs. White's pardon for making an assault upon her, and that in answer to that offer Mr. White told him it wasn't necessary. We think it is admissible for the further reason that your Honor has permitted the witness for the State to testify that Alexander said he had an engagement, and that the witness testified that Alexander had made inquiries as to the residence of Malcolm Stephens, and it is certainly admissible for the purpose of showing that Alexander could not have said that there was any engagement between himself and White or between himself and Stephens, or any obligation upon him to come down there at 10 o'clock at night and make any apologies to Mrs. White. Judge Liddon: We object. The Court: Objection sustained. Mr. Price: Defendant excepts. The jury returns to the box. Dr. Alexander, Mr. White and myself were together at the court room about thirty

minutes. Alexander left first. There was no agreement or understanding between White and Alexander that there should be any subsequent meeting. I suppose White left in a minute after Alexander did, maybe two minutes; it was a very short time. I came down stairs with Mr. White. We walked down these steps and went up town and I went home. The next time I saw Jim was after the homicide. I heard the shooting; I had not gone to sleep. I don't know how much time exactly had elapsed from the time White and Alexander had separated at the court house until I heard the shooting; I would fix the time anywhere from fifteen to thirty minutes. I had been home some little bit, I suppose about three-quarters of an hour, refreshing my memory. I though the first firing was the whole round, but I am convinced it wasn't. It was very rapid. (Witness indicated how the shots appeared to him by slapping his hands together.) The first three were rapid; there was a slight pause between the third and fourth, and between the fourth and fifth. The first three were so rapid you could hardly distinguish one from the other. I was out on the streets that night after the homicide was committed. I know where a large oak tree stands. It was dark around that tree. Thereupon the following question was asked: 'Could a man coming down the street see a man about that tree in a distance?' Judge Liddon: We object. The Court: No, that would be an opinion of the witness. Mr. Price: Defendant excepts. The light from the electric light at the far corner showed very little light under that tree. It was dark there, and it was a cloudy night.

CROSS EXAMINATION.

When I say there was no agreement for a meeting after they were here at the Sheriff's office together, I mean

there was none that I know of. I didn't stay with White any more after we left the court house. I know that Jim White went to the academy that night. I went with him. I suppose that Alexander came here to the court house at the request of Jim White. I did not come with them, I was on ahead of them; when I saw them coming out of the academy I came on ahead. I heard some hollowing while the shooting was going on. It was screaming; I think between the fourth and fifth shots I heard him say, 'Jim, don't kill me.' I heard the screaming between the third and fourth shots. There were three shots fired rapidly, and immediately after that I heard the screaming. I couldn't tell anything that was said, it was just hollowing out loud. After the fourth shot I heard him say, 'Jim don't shoot me,' or don't kill me, one of those remarks. That was just before the last shot and that was the last I heard of the hollowing or screaming.

## REDIRECT EXAMINATION.

I was ahead of Mr. White and Dr. Alexander coming back from the academy; I suppose I was twenty-five yards ahead. That is an estimate. There was nobody else along with White and Alexander, they came down by themselves. They came up in the Sheriff's office. I heard some shooting and I heard some hollowing down there where the shooting took place. I was just across the street from there, and I think the streets are sixty feet wide. If there was any remark made as 'Men, please don't let them kill me,' I didn't hear it. I don't think the street is over sixty feet wide. I was sitting up at the time.

## RECROSS EXAMINATION.

I am related to the defendant. I am his brother-in-law."

6—Vol. 59.

The thirty-second to the forty-fourth assignment inclusive are all based upon the rejection of proffered testimony of this witness. I shall consider them all together, in that declining to follow the example of defendant's counsel, who have argued them all separately. I shall not enter upon any extended discussion. Suffice it to say that, after a careful consideration thereof, no reversible error has been made to appear to me. Much of the proffered testimony related to self-serving declarations and acts of the defendant, as to which I refer to what I have already said in discussing the twentieth assignment. See authorities there cited, especially West v. State, 53 Fla., 77, 43 South. Rep., 445. Some of such testimony was clearly immaterial and not pertinent to the case. I do not think that any of the conversations and acts which took place in the Sheriff's office, as offered to be proved by the witness could be properly said to form a part of the *res gestae,* so as to render the same admissible. I do not see their connection with the homicide. See Stitt v. State, 91 Ala., 10, 8 South. Rep., 669, 24 Am. St. Rep., 853; Patterson v. State, 156 Ala., 62, 47 South. Rep., 52; Raines v. State, 81 Miss., 489, 33 South. Rep., 19, which was approved and followed in Hughes v. State,     , Miss.,     , 38 South. Rep., 33. I recognize the fact that there is some conflict in the authorities, and I have carefully examined those cited to us by the defendant, but, in the light of our own decisions, I am of the opinion that these assignments have not been sustained.

For like reasons, I think that the assignments numbered from forty-five to fifty inclusive must fail, all being based on the exclusion of certain testimony sought to be elicited by the defendant from Jim Lewis.

The fifty-first, fifty-second and fifty-fourth assignments question the rulings of the court in refusing to permit W. A. Lewis, one of the defendant's witnesses, to answer

certain questions propounded to him on his direct examination. The witness had testified to having had a talk with the defendant in front of Alderman's store on the night of the tragedy from ten to twenty minutes prior to the time the witness heard the shooting, which resulted in Dr. Alexander's death. He was then asked to "state what was said in that connection." The objection was properly sustained thereto. What I have said just after disposing of the twenty-eighth assignment, in discussing the assignments based upon proffered testimony of Malcolm Stephens, is alike applicable here. This also applies to the fifty-second assignment, which was based upon the court sustaining an objection to the question, "What was that conversation,—what was said by White in that conversation about Dr. Alexander?" Prior to the propounding of that question, the witness had testified that the conversation with the defendant to which he referred was concerning Dr. Alexander. I think that each of these questions was too broad. I am all the more impressed with the correctness of the conclusion which I have reached after reading the statement of the defendant's counsel as to what they expected and proffered to prove by such witness. Much of it was in the nature of self-serving declarations by the defendant, as to which I have already expressed my opinion and cited authorities. The jury had been withdrawn under the direction of the court, while the defendant's counsel stated what they expected the witness to testify to in response to the questions to which the State had objected. Certain proceedings then occurred which I think it advisable to copy from the bill of exceptions for the proper understanding of this opinion. They are as follows:

"(Thereupon the jury was recalled and the taking of testimony resumed.) In the conversation I had with Mr. White on the night of April 12th, in front of Alderman's

store, he did say something about what he would do if Dr.
Alexander didn't leave town. He said if Dr. Alexander
didn't publish in the paper his apologies to the people of
Jackson county, in the town of Marianna, that he had to
leave town. He did not say anything to the effect that if Dr.
Alexander didn't leave town that night there would be a
dead man in Marianna next morning. Thereupon the fol-
lowing question was propounded: Did he or not say his
apologies for what? Judge Liddon: We object. The
Court: The objection is sustained. Defendant excepts.
Mr. Kehoe: We proffer to prove ——Judge Liddon: We
object to his stating what he expects to prove in the pres-
ence of the jury. The Court: You have that already in
the record. Mr. Kehoe: If the court please, we think
not, we think it necessary to offer it now. The Court:
This constant moving to and fro of the jury is a hardship;
I don't think it is necessary. I can see how it can be
avoided and I don't see why counsel can't see it. Of
course, the jury must retire again if you are going to make
another proffer. Mr. Price: We except to the remark of
the court, that the court don't see any necessity for the
jury retiring. We don't ask that they shall retire. Mr.
Wilson: Then the State does ask that they retire. There-
upon the jury retired. The Court: I will say now that the
remarks last made were not necessary, and were made
evidently to create a false impression on the jury, that the
court was responsible for the situation existing; it is not
exactly fair to the court. I have indicated a line of pro-
cedure that will obviate this and not sacrifice a single
right of the defendant. Mr. Kehoe: Will the court permit
me to address the court? I will assure the court that the
remarks made were not for the purpose of getting any-
thing improperly before the court and the jury, and we do
not think it is a fair criticism in the presence of the jury
or in their absence; we know that your Honor has a broad

discretion in matters of this kind; we have absolute confidence in the faith of your Honor, but we do frankly believe that you are abusing that discretion, and in taking an exception to the ruling of the court, we do so in the knowledge that there will be an opportunity for the Supreme Court to say whether or not your Honor has abused this discretion. The Court: The court has no intention of depriving you of a single right, but counsel in their zeal for their client's interest—and it is a commendable zeal—ought to sometimes think of the rights of the court; counsel make remarks, whether intended or not, which have the effect of reflecting on the court or the court's fairness; sometimes it is in the manner; sometimes it is in the tone of the voice. Counsel have no right to forget that the court has rights as well as counsel; all the rights are not with the practitioner. Mr. Kehoe: I think the court will concede that everything we have said has been said in a respectful manner. The Court: Counsel owe it to the court to assist in facilitating causes; there are hundreds of cases pending in the courts and litigants have a right to their fair share of the court's time, and it is the duty of counsel to save as much time as possible. It is for that purpose that the court has made suggestions; the weather is hot, everybody is tired out, and the court thinks it has not had as much assistance from counsel in the way of facilitating business as it ought to have. Mr. Kehoe: We have tried to be respectful; if we have failed we regret it. We honestly believe the court is wrong. We would be false to our client and false to ourselves if we allowed an undue respect for the court to cause us to neglect our client's interests, to sleep over our rights. I will state, if at this time, or at any time, the court thinks I have failed in respect to the court, I will gladly apologize, but so far as not registering exceptions to the rulings of the court when we think the court is in error —— The Court: I have not

asked for apologies or claimed any were due. Mr. Kehoe:
In response to the last question we expect to prove that
he said he must publish his apologies in the paper for hav-
ing made an assault on his wife, White's wife, or leave
town. That is the answer we expect to elicit. Mr. Wil-
son: We object to the question, and what they expect to
prove. The Court: The objection is sustained. Mr. Ke-
hoe: The defendant excepts. (The jury return to the
box.)"

The defendant earnestly contends that the proffered tes-
timony was admissible by virtue of the fact that as the
State had introduced a portion of the conversation re-
ferred to by T. G. Alsobrook, therefore he was entitled to
have go before the jury the other parts thereof, so that they
would have the benefit of the entire conversation. I find
that the witness Alsobrook had testified that he saw the
defendant "shortly before the shooting took place," esti-
mating the time at about fifteen minutes, sitting on a
bench in front of Mr. Alderman's store with Gus Lewis;
that as the witness passed them he heard the defendant
make a remark to the effect that "if he didn't leave town
to-night there would be a dead man in town to-morrow,"
but that he "didn't stop to hear to whom he was refer-
ring." On cross-examination he testified, "I didn't hear
the first part of the conversation; that is all I heard, that
if he didn't leave town there would be a dead man in town
to-morrow. I didn't hear any name called. I don't know
of my own knowledge who that remark had reference to."
This is all that such witness testified to concerning that
conversation. I fully approve of our holding in Fields v.
State, 46 Fla., 84, 35 South Rep., 185, upon which the de-
fendant relies, that "where part of a conversation is given
in evidence the defendant is entitled to have before the
jury all that was said upon the subject upon the particular
occasion, whether prejudicial or beneficial to him. The

whole conversation should be given." Also see Thalheim v. State, 38 Fla., 169, text 199, 20 South. Rep., 938, text 947, and Williams v. Keyser, 11 Fla., 234, text 244, S. C., 89 Am. Dec., 243, both of which are cited in Fields v. State, *supra*. I am of the opinion that these authorities do not sustain the defendant's contention. I think that the trial judge did permit the witness, W. A. Lewis, to give in testimony all the portions of the conversation had between him and the defendant, to which Alsobrook had referred in his testimony, which related "to the subject matter of the suit" and which were not violative of other well established rules of evidence. This is in accordance with the cited decisions of this court and is the full extent to which they go. It will be readily seen from the admitted testimony of such witness, which I have copied in this opinion, that he was permitted to testify as to the remark which Alsobrook had testified that he heard the defendant make to the witness as he passed by them, which was that such remark did refer to Dr. Alexander, but that the defendant "did not say anything to the effect that if Dr. Alexander didn't leave town that night there would be a dead man in Marianna next morning," but that what the defendant did say was "If Dr. Alexander didn't publish in the paper his apologies to the people of Jackson county, in the town of Marianna, that he had to leave town." I further find that the defendant as a witness in his own behalf was permitted to testify concerning the conversation he had with Gus Lewis, in which he denied having made the remark which Alsobrook had testified that he heard him make and stated that what he did say was "that if he didn't leave town to-night or publish his apologies in the paper I would publish him myself to the people in this town and the surrounding country." He further went on to testify, "that I thought it was a courtesy I was due to the people of the town, for the assault he had made on my wife." It is true that the

State moved to strike out this last quoted portion of his testimony, but the court denied the motion, saying that he would "instruct the jury at the proper time." This disposes of the fifty-first, fifty-second and fifty-fourth assignments adversely to the contentions of the defendant. They have not been sustained.

The fifty-fifth assignment is based upon the statement made to counsel for the defendant by the court in the presence of the jury as to "this constant moving to and fro of the jury" being a hardship, which I have already copied herein in full. I set forth the full proceedings relating thereto in order to show just what did occur and what called forth the remark. I fully approve of our holding in Mathis v. State, 45 Fla., 46, 34 South. Rep., 287, as in both prior and subsequent cases, that "the utmost care should be used by the trial judges, especially in cases where human life is involved, not to let any expression fall, either by question or otherwise, that is capable of being interpreted by the jury as an index of what he thinks of the prisoner, his counsel or his case." I would also call attention to our discussion of this point in the cited case. As was said there, I think that it would have been better if such statement had not been made, but, under the facts and circumstances disclosed in the bill of exceptions in connection therewith, in this case, as in that, "we do not think the error sufficient to warrant a reversal of the case." There was some justification for it, as appears in the explanation or statement of the trial judge, after the jury had retired, and as is also apparent elsewhere in the bill of exceptions. In their zeal and earnestness displayed on behalf of their client, we think it plainly appears that the defendant's counsel did repeatedly try to get before the jury certain testimony which the court had held improper and inadmissible. It would further seem that the trial had been somewhat unduly protracted by the course pur-

sued by counsel and that the trial judge had been forced to send the jury out oftener than should have been necessary. It was a hardship upon them and that fact in itself may have had more of a tendency to prejudice them against the defendant or his counsel than the remark made by the trial judge.

The fifty-eighth to the sixty-eighth assignments inclusive must also fall for the reason that they are all based upon the exclusion of proffered testimony, which not only formed no part of the *res gestae* but for the most part related to the self-serving declarations and acts upon the part of the defendant. It was sought to show that on the night of the homicide the defendant had conversations with certain named persons in which he requested them to go that night and see Dr. Alexander for the purpose of discussing with him the matter of the assault which the defendant claimed Alexander had made upon his wife, but as a matter of fact no testimony was proffered to the effect that any of such requested persons did see or have any conversation with Dr. Alexander on that night; on the contrary, it would appear that they did not. It was clearly inadmissible testimony to show these conversations by the defendant and such requests upon his part.

The sixty-ninth and seventieth assignments are based upon the refusal of the trial court to permit the defendant to prove by Miss Richardson, the stenographer who took down the testimony of the witnesses at the preliminary trial of the defendant, certain testimony given in thereat by Dr. N. A. Baltzell. I find that Dr. Baltzell had testified as a witness in this case on behalf of the State and had stated in such testimony that he had occasion to examine the body of Dr. Alexander shortly after his death. Among other things, he had testified, in speaking of a certain wound which he found on the body, as follows: "I made only one examination of the body. I examined the body.

some little bit on that occasion, but I was there only a few minutes at the time. My opinion is that this wound in the abdomen was making its exit therein the front, coming from behind,—forward. When I first saw the body of Dr. Alexander, the wound that presented itself first to my attention was this wound I first described; my first presumption was that it entered from the front. My first impression when I saw the wound in the abdomen, Dr. Alexander lying on his back at that time, the mental impress given me at that time was that the wound must have entered from the front. After that, when Mr. Calhoun was there, I suggested that we turn the body over so it might be further examined; we looked at it more carefully, and we could come to no definite conclusion as to whether it entered from the front or the rear. The significance of a wound entering and coming out of a body has a bearing upon the size of the hole made in going in and coming out. We got our opinion in that way. The rule is, and I don't know of any exception to it, that there would be a larger point of exit than of entrance. The tissues did not show a very great amount of difference on this occasion, and I could not swear positively at the time of my first testimony given in this case that it did go in there from the front or the rear, and I could not make up my mind positively if there was any very considerable difference; there was little if any. Later on I had occasion to examine the clothes of Dr. Alexander and my conclusions along the hypothesis I have mentioned as to the entrance being smaller than the exit was confirmed. I found, taking from the coat in the rear, a very small bullet-hole, then I traced the bullet-hole through the lining of the coat, then into the lining of the vest, then through the shirt, then through the undershirt, then through the body of Dr. Alexander, then forward into the clothes as I have described—only forward, finally out, through the undershirt, the outer shirt

and through the vest and out; the vest was the last garment through which the bullet passed since evidently the coat was not buttoned up; there was no bullet-hole in the coat in front; there was a bullet-hole in the coat in the rear. I examined these garments closely and the most positive evidence I came to was, aside from the fact that the smallest hole was in the rear, a gradual increase in size, and more or less irregular, forward from behind, taking up the shirt, which was a pleated bosom shirt. (Here counsel exhibits shirt to witness, and after examining same witness testified: This is the shirt; as I say, seeing gathering up this shirt and making a careful examination of the shirt, I began to look at it very closely following the range of these bullets, I noticed in one of the pleats that the hole made by the bullet was covered partially over as is shown here by this pleat. (Indicating.) The pleat covered the hole partially. My conclusion was this,—it would have been practically impossible for this bullet to have gone in forward and the hole to be covered by this pleat or any part of the pleat, but it would have cut the pleat before making the hole, but coming this way, it would cut the shirt and brush the pleat out of the way and not necessarily cut the pleat itself; that is the impression made on me—my conclusion for the direction of the bullet. I found the shirt in the vault at the First National Bank. I made the examination of these clothes perhaps about noon the following day after I examined the body of Dr. Alexander the night before. He didn't have any clothes on when I examined him the first time. (Here coat was exhibited to witness). This is the same coat that I saw bullet-holes in. (Vest exhibited to witness.) That is the vest. I didn't see anything at all that attracted my attention to the trousers;—this is the undershirt. I don't remember making any examination of the underclothes."

On cross-examination the witness testified: "I only visited the body one time, one occasion, and all the examination I made was on that occasion. That was about 12:30 the night of the killing. The body was in Dr. Alexander's office at that time. I was from five to eight minutes perhaps making the examination. I was as deliberate in making the examination as one could be in a period of five or eight minutes. I had other business on hand; however, I don't know that I would have made a more careful examination if I had had more time; I satisfied myself as far as conditions presented themselves. I think I made the examination about 12 o'clock at night. I think I had some lamp lights. I don't think it was an electric light. I testified before the coroner in this case. I testified twice that day, once before I looked at the clothing and once in the afternoon after I had looked at the clothing. In the morning before I looked at the clothing I referred to and described this wound in the abdomen. I think I made the remark that in my judgment the wound entered from the front and made its exit to the rear, or used the word, 'it is my presumption;' I will say just here, if you will allow me, since making that statement I have seen two copies of the testimony as taken; I didn't take them both and compare them to see,—the signed copy, I signed in Judge Williams' court, and my recollection is that the word 'presumption'— 'it is my presumption' or using the word 'presuming' in that connection,—it came from the front and went to the rear, the back; I, however, here in court, saw some of the testimony taken and was looking over it and that attracted my attention,—it wasn't in there; now, I wouldn't swear whether it was left out, but I thought at the time that the word 'presumption' was left out of one copy. I don't recollect whether Miss Allie Richardson was reporting that case stenographically or not, I could not swear it. This question was asked me in the morning examination: 'You

said something about the wound in the back, you examined where the bullet was supposed to have entered, was that wound, in your opinion, where the same went in, the upper part of the abdomen,' and I answered about this way: 'I am fairly sure that it was; I am not prepared to swear positively that the wound went in from the front or the rear; it didn't follow the usual descriptions of exits and entrances of wounds; to the very best of my ability I examined him three times I think and ascertained positively in my mind that fact. The rule following the entrance and exit of a wound is that the exit is almost invariably larger than the point of entrance. I found that if there was any difference at all it was very slight; I think that the mere eye would give you very little information on the subject; the presumption in my mind was that the wound was from the front rather than from the rear.' That was the impression I had the first time I testified after examining the body. On cross-examination I was asked this question by Mr. Price: 'I believe you stated that to your best judgment that wound went in here is the one that went out in the back,' and I guess I must have answered 'yes, sir.' I don't recall just that answer. I was called back in the afternoon, after I had examined the clothing. I suppose in the afternoon I was cross-examined by Mr. Price. In answer to the question, 'you are not willing to swear now absolutely that the wound was from the rear or the front,' I stated that I would not swear positively, that I couldn't swear that the evidence of the wound was greater of its coming from the rear than from the front. I also stated that I examined the clothing casually, only picked up one piece, that I was in a great hurry to leave there, and only looked at the wounds as Judge Williams asked me. I will swear that there is more reason for believing that the wound, the wound that shows itself in the front and back, entered from the rear than

there is for its having entered the front. I can't say I am positive; it would seem a practical impossibility to say. I would have said I was not in a position to swear positively whether it entered from the front or the rear if I had never seen any clothing at all. When I testified before the coroner in the morning part of the day, I said that it possibly could have come from the front, or words to that effect, and you will notice before that I said, 'it is my presumption;' I could not get my mind clear as to whether it was from the front or the rear. Before I examined the clothing I was in great doubt, and the burden of doubt, I am not sure on which side,—I may have been impressed, first seeing the wound from the front—just as if seeing it on anybody or anything—first seeing it on the front, my first mental impression on my mind was that it must have come in that way; that was my first impression; then Mr. Calhoun and I lifted the body and turned it over two or three times to see if we could see the direction of that bullet; we did not; I had no positive opinion about it, because I could not see the sign of which way it went. I made the examination assisted by Mr. Calhoun, and it was complete before I testified before the coroner's jury. The County Judge was present when I made the examination, I was called in by him. It is possible that, in the presence of the coroner and the coroner's jury on that occasion when I made that examination, I stated to them, after having made that examination, that it was my opinion that the shot had entered from the front and made its exit in the back; I don't recollect; as I say, my first impression was, seeing it from the front, and not seeing it in the rear, I could not say, I don't recollect. It is a fact that the impression I have at this time is from an examiation of the clothing rather than from an examination of the body. I arrived at that conclusion from the examination of the clothing I have identified here."

I now copy the following proceedings from the bill of exceptions in order to show clearly the basis for the two assignments I am now considering: "Q. Miss Richardson, was Dr. Baltzell a witness on the former trial of this case? A. Yes, sir. Q. You took down his evidence did you? A. Yes, sir. Q. Will you state whether or not the following question was asked Dr. Baltzell: 'You said something about the wound in the back, you examined where the bullet was supposed to have entered, was that wound in your opinion where the same went in the upper part of the abdomen?' Judge Liddon: We object. Dr. Baltzell didn't deny any of that testimony. The Court: No, he admitted that; I don't think it is necessary to go into it. Mr. Kehoe: I think he said that it might or might not be that it entered from the rear. The Court: He admitted all that you read from the transcript, and all you called his attention to; it is unnecessary to go over it again. Mr. Kehoe: I desire to offer in evidence that his answer was as follows: 'I am fairly sure that it was, though I am not prepared to swear positively that it went in from the front or rear. It did not follow the usual description of entrance and exit wounds. To the very best of my ability I examined him three times I think, and ascertained positively in my mind that fact.' Mr. Wilson: We object to that testimony; Dr. Baltzell has not denied that. The Court: Objection is sustained. Mr. Kehoe: Defendant excepts. Q. Turn to page 11—was Dr. Baltzell asked this question upon cross-examination: 'I believe you stated your best judgment was that the wound that went in here is the one that went out the back? Judge Liddon: We object. The Court: I have already sustained the objection. Mr. Kehoe: We proffer to prove that Dr. Baltzell testified in his best judgment, that the wound entered in the front and went out the rear. Judge Liddon: You offer to prove that by Miss Richardson?

Mr. Price: Yes. Judge Liddon: We object. The Court: Objection sustained. Mr. Price: Defendant excepts."

I am of the opinion that, as Dr. Baltzell did not deny having made these statements so sought to be introduced but practically admitted that he had done so, no error was committed in excluding them. See Myers v. State, 43 Fla., 500, 31 South. Rep., 275, construing section 1102 of the Revised Statutes of 1892, now section 1511 of the General Statutes of 1906, under which such former testimony of the witness was claimed to be admissible. It would also seem to be doubtful whether any sufficient or proper predicate had been laid for the introduction of the proffered testimony. See Simmons v. State, 32 Fla., 387, 13 South. Rep., 896, and Sylvester v. State, 46 Fla., 166, 35 South. Rep., 142. Be that as it may, no error has been made to appear to me in the rejection of this testimony.

The seventy-first assignment is based upon the refusal of the trial court to let the defendant prove by Miss Richardson certain testimony given in by E. J. Schell, a state witness, at the preliminary trial. This assignment must fall with the sixty-ninth and seventieth and for like reasons.

The seventy-first to the eighty-first assignments inclusive are all based upon proffered and rejected testimony of Mrs. Susan Bettie White, the wife of the defendant. Again I am forced to copy the proceedings, so as to show what actually occurred, in order to make these assignments clear and my disposition thereof understood:

"My name is Susan Bettie White. I know the defendant, J. V. White. I am his wife. I knew Dr. S. B. Alexander when I saw him. I recollect hearing of Dr. Alexander's death. The last time I saw him alive was in his office. It was on the same day that I heard of his death that night. His office was located over Porter-Carroll Hardware Store, in the town of Marianna. I was up in

his office at that time. Thereupon the following question was propounded: Q. For what purpose did you go there? Judge Liddon: We object; it is irrelevant and immaterial, the purpose for which she went to his office. The Court: Objection sustained. Mr. Price: Defendant excepts. (Thereupon, upon the instructions of the court the jury retired.) Mr. Price: We offer to prove by this witness that she had gone to the office of Dr. Alexander for the purpose of having some dental work done by him on the morning prior to his death that night. The Court: What else? Mr. Price: That is all I am proffering right now. Judge Liddon: We object. The Court: Objection sustained. Mr. Price: Defendant excepts. The Court: Now, if you have anything else along the same line it might be presented now in order to facilitate the trial. Q. Please state whether or not Dr. Alexander completed the work for you that you went there to have done that morning. Judge Liddon: Same objection. The Court: Objection sustained. Mr. Price: Defendant excepts, and in answer to that question we proffer to prove by this witness that Dr. Alexander did not complete the work that she went there to have performed on that morning. Judge Liddon: We object. The Court: Objection sustained. Mr. Price: Defendant excepts. Q. If you state that Dr. Alexander did not complete the work that you went there to have him do, then state why he did not complete the work. Judge Liddon: We make the same objection. Mr. Price: We offer to prove by this witness in answer to that question that Dr. Alexander started to perform the work that she went there to have performed; that while in the course of his work he put some kind of medicine in her tooth and that while waiting for the medicine to take effect he placed his arm around this witness and kissed her several times without her consent and against her wishes. The Court: The objection is sus-

tained. Mr. Price: Your Honor will note an exception. Q. Please state for what reason you left the office of Dr. Alexander. Judge Liddon: We make the same objection. Mr. Price: We proffer to prove by this witness that she left the office of Dr. Alexander for the reason that he assaulted her, and after such assault was made she immediately left the office in indignation. The Court: The objection is sustained. Mr. Price. The defendant excepts. Q. Please state where you went immediately after going to Dr. Alexander's office. Judge Liddon: We make the same objection. The Court: The objection is sustained. Mr. Price: Defendant excepts, and we proffer to prove by this witness that after the assault was made upon her she left the office and went at once to her mother's who lived in the town of Marianna. Q. State whether or not you made any complaint to your mother as to the assault being made upon you by Dr. Alexander? Judge Liddon: We make the same objection. The Court: Objection sustained. Mr. Price: Defendant excepts. We proffer to prove in answer to that question that immediately after leaving the office of Dr. Alexander this witness went to the home of her mother and that she then made complaint of the conduct of Dr. Alexander toward her. Q. Please state what else Dr. Alexander did towards you while you were in his office. Judge Liddon: We make the same objection. The Court: Objection sustained. Mr. Price: Defendant excepts. We proffer to prove by this witness that immediately after making the assault by Dr. Alexander upon this witness that she started to leave the office and that he intercepted her at the door with the intention of preventing her from leaving the office. The Court: Objection sustained. Mr. Price Defendant excepts. That is all we proffer to prove by this witness that occurred at the office; I want to ask her where her husband was that day. The Court: Will you intimate to the court what questions

you expect to ask?   Mr. Price:   If the court please, I
cannot recollect the questions.   After I ask a dozen ques-
tions I cannot remember what I have asked.   The Court:
Have you any more questions along this line to ask?   Mr.
Price:   I have not, about Dr. Alexander.   The Court: You
know what the court means; if you have any other ques-
tions about that matter you can propound them now.   Mr.
Price:   I am not ready to propound these questions now.
The Court:   Then I will stay here until you are ready.
Mr. Price:   I expect later on to have some questions; I am
not ready to propound them now; I expect to ask her as to
her husband being in town.   The Court:   If you have any
further questions about the matter you have been asking
about you can ask them.   Mr. Price:   I am not going to
ask her any other questions about what I have asked her
about.   The Court:   Then I expect we will have to ad-
journ.   Mr. Price:   I am not asking the court to adjourn.
The Court:   You can ask these questions now, or you will
not be permitted to ask them.   Mr. Price:   I desire to take
my own time.   I have some other questions that I know
are relevant to go before the jury—I have another ques-
tion which I wish to ask her ——  The Court:   I say any-
thing else about this matter.   Mr. Price:   I am not going
to ask anything about what occurred in that office.   The
Court:   You understand what the court means; you under-
stand that the court has read the transcript of the testi-
mony taken before the coroner and is familiar with all of
this testimony.   The court knows and you know exactly
what questions you have in mind.   Mr. Price:   I have told
the court I expect to ask some further questions; I expect
to ask her if she made complaint to her husband.   The
Court:   It will be objected to; you may as well ask that
question now.   Mr. Kehoe:   We have a line of questions
which we desire to ask which are not objectionable, and
then we have some questions ——  The Court:   You can

ask those that are proper and omit the others. Mr. Kehoe: If the court please, we have some questions which we think are proper; our position is this: We have some questions which are proper, and then we have some questions which would necessarily follow, which we think are proper, but which under your Honor's ruling will be objected to and the objection will be sustained. We think if we ask these questions now, and they are objected to and the court sustained the objection, it will be proper, but if we ask these questions after we have asked some other questions, after we have laid a predicate for them, we believe your Honor will be in error to sustain the objections to them, and that is the reason and the only reason why we insist upon asking these questions after we have asked other questions. The Court: I say you can go ahead and ask all the questions you desire to ask, and the court will point out which are proper and which are not proper, and then the questions being in, the jury can return to the box and the examination of this witness can be finished. The counsel have no right to try to control the court; it is the court's right to control counsel. Mr. Kehoe: It is not with any intention of controlling the court. I think this,—I may be in error, but I would like to be heard; I may be in error but I am honest in it. Suppose this case should go to the Supreme Court, suppose I should ask a question which appears to be irrelevant and immaterial, and it should be objected to on that ground, and the court should sustain it; then, in reviewing it, the Supreme Court would hold it irrelevant and immaterial; but if after laying the proper predicate I should ask this question in the proper order, it could then be viewed from the circumstances at the time the question was asked. The Court: The question can be asked now and go into the proper place in the record. Mr. Price: The defendant excepts. (By the witness): My husband was deputy sheriff. He was not at home on the

day I went to Dr. Alexander's office; he was absent from town on that day. The first time I had occasion to talk with him was that night at supper time. Thereupon the following question was asked: State whether or not you informed your husband when he came in that night as to what occurred in Alexander's office that morning? Judge Liddon: We object. The Court: Objection sustained. Mr. Price: Defendant excepts. We proffer to prove in answer to that question, that when Mr. White came home his wife, this witness, made complaint that Alexander had insulted her in his office and had assaulted her while she was there having some dental work done. In offering this testimony, may it please the court, it is the view of the counsel for the defendant that any matter that would go to make a provocation for the commission or for the taking of human life is relevant and material to go before this jury, or any other matter that would be of such a nature or character as to greatly incense a person, and by reason of that to cloud his senses or obscure his reason, it is certainly relevant to go before this jury for their consideration. We also think it necessary upon this theory: He is charged with murder in the first degree, and any fact or circumstance which would have a tendency to show there was no intent on the part of the defendant, would reduce it to manslaughter, by reason of being thrown into it by the assault upon his wife made by a person holding the position that Dr. Alexander did, is certainly relevant to go before this jury. The Court: I don't think it is relevant or material to go before this jury. It is unnecessary to explain why I don't think so. The objection will be sustained. Mr. Price: Defendant excepts. Q. What was your condition, Mrs. White, when your husband came home that night? Judge Liddon: We object. The Court: Objection sustained. Mr. Price: Defendant excepts. We expect to show in answer to that question that

Mrs. White was in an intense nervous condition at that time; she was crying and in such condition as would naturally excite any husband or any man. The Court: Objection sustained. Mr. Price: Defendant excepts. Q. Did you see your husband any time from the time you left Dr. Alexander's office until you saw him that night after his return from the country? Judge Liddon: We object; we don't see the materiality.? The Court: Objection sustained. Mr. Price: Defendant excepts. We proffer to prove in answer to that question that she did not see her husband from the time she left Dr. Alexander's office until after dark that night, and she then made complaint. The Court: I don't think she can answer that. The jury having returned to the box, the reporter was directed to read the questions which were held to be admissible. Q. Mrs. White, what official position did your husband hold? A. He was deputy sheriff. Q. On the day you went to Dr. Alexander's office was he at home? A. No, sir; he was not. Q. You say he was absent from town on the day you went to Dr. Alexander's office? A. Yes, sir. Q. Did you see your husband at any time from the time of your leaving Dr. Alexander's office until you saw him that night after his return from the country? A. No, sir. Q. Did you have any conversation with your husband when he returned from the country? Judge Liddon: We object. The Court: You have asked that question; objection will be sustained. Mr. Kehoe: If the court please, we ask leave to ask of this witness each of the questions that were propounded a few moments ago during the absence of the jury. The Court: You have given your questions and answers; there is nothing more to go into the record. Mr. Kehoe: We reserve an exception to the refusal of the court to permit us to ask the questions which were objected to and to which your Honor sustained the objection. The Court: No, you cannot do that. Mr. Kehoe: You will

not permit us to do that? The Court: No. Mr. Kehoe: Defendant excepts."

I see no necessity for any extended discussion of these assignments, and, even if I did deem the same advisable, the length to which this opinion has already grown would preclude it. Suffice it to say that a careful reading of such proceedings, in connection with the defendant's brief and the authorities cited by him, fails to disclose any reversible error to me committed in any of the rulings upon which these assignments are based. Much of what I have said in disposing of other assignments is also applicable here. This discussion, together with well settled principles of evidence will show, I think, that the proffered testimony was properly excluded and that these assignments have not been sustained. If the defendant had not presented such a multiplicity of assignments to us, I would have treated the questions here presented more fully. As it is, I can only declare that, as the same are presented to us, I have found no reversible error in the exclusion of such testimony.

The defendant also sought to introduce testimony along similar lines and to the like effect by Mrs. Lula King, the mother of Mrs. White, the exclusion of which forms the basis for the eighty-second and eighty-third assignments. They must fall with the preceding assignments.

The eighty-fifth to the eighty-ninth assignments inclusive are all based upon the sustaining of objections interposed by the State to certain questions propounded to the defendant, who had taken the stand as a witness in his own behalf. I now take up these in their order for treatment. The eighty-fifth assignment is that the court erred in refusing to permit the defendant to answer the question, "What commenced the altercation between you and him there, and caused the blow to pass?" The defendant had just testified as follows: "I had known Dr. Alexander

for some little time; I had seen him that night before the difficulty occurred. I saw him at the school house, as he was coming outside. He came out of the school house because I asked Mr. Cephas Wilson to tell him to come out; I wanted to see him. He came out immediately. There was no one with me at that time. That was about 9:00 o'clock I think; I could not state exactly. He and I went from the school house to the sheriff's office in this building. No one was with us on the way. I, at that time, was deputy sheriff, and was in the habit of carrying a pistol. At the time I met Dr. Alexander at the academy I had a pistol. We had no dispute, or misunderstanding in the least, while we were going from the academy to the sheriff's office. I at no time between the academy and the court house drew my pistol, or attempted to draw it. I did not threaten to do him any violence from the time we left the academy until we got to the court house. The sheriff's office is the back office on this side, up stairs. When Dr. Alexander and I came up the steps Mr. Malcolm Stephens was right at the top of the steps; the office was locked; I unlocked the door and we all went in, Mr. Stephens, Dr. Alexander and myself. I asked them to have seats. I pulled off my coat and laid it on the table, and then I kind of sat on the table. I suppose we staid in that room together fifteen or twenty minutes; probably twenty-five. Malcolm Stephens was present during the entire time. At that time I had my pistol with me. I did not draw it, or make any attempt to draw it. I did not assault or attempt to assault him at any time while we were in there with any pistol or any weapon. Dr. Alexander left before I did. I struck Dr. Alexander with my hands while he was in there; I struck at him once, and struck him once with my fist. He stayed five minutes after that, I should think. I made no further effort to strike him."

Then this question was propounded, whereupon objec-

tion was interposed by the State. The jury was withdrawn and counsel stated that they proffered to prove by the witness, in response to the question: "that the altercation about which he testified came up in the sheriff's office when Mr. Malcolm Stephens was present, and that it immediately followed an admission made by Dr. S. B. Alexander, that he had, on the morning of that same day in his dental office, while the wife of the defendant was there for treatment, put his arms around her and kissed her upon the forehead and upon the cheek; and upon his admission that he did not know why he did it, except that it is one of the human weaknesses, and that he had passions like other men. We further proffer to prove, in response to the same question, that he, Dr. Alexander, was leaving the office, having been let out of the office by the defendant, and the defendant told Dr. Alexander that it was his purpose to publish him to the people of Marianna publicly the next morning, and that the last thing that Dr. Alexander said before leaving and the last words that he said to the defendant before the meeting just preceding the shooting, was, 'Jim, for God's sake don't do that; it will ruin me here in Marianna.'"

The court sustained the objection. No error is made to appear here. What I have said, in treating former assignments, concerning self-serving declarations, and evidence of a former difficulty not being admissible, unless shown to form part of the *res gestae,* applies with equal force here. While the jury was still out, the defendant testified that on the evening of April 12th, he first went to my house about five or five-thirty, and that he first talked to his wife about 7:30. Thereupon the following question was propounded to him: "At that time did she or not tell you or say anything to you about or concerning Dr. Alexander?" The State objected thereto, the defendant's counsel stated: "We proffer to prove by this witness, in response to the

question just propounded, that at that time his wife told him that on the morning of that same day she had gone to Dr. Alexander's office to have some dental work done, and that while in the chair, against her will and without her consent, that Dr. Alexander made an assault upon her; that he forcibly put his arms around her and kissed her upon the forehead and twice upon the cheek; that she immediately got up from the chair and attempted to leave the office and that he stopped her at the door and tried to prevent her going away from the office, and that at that time this was in the up-stairs part of what is known as the Dekle Building, and that there was no person there except Dr. Alexander and the defendant's wife, and that the adjoining room in which she was for the purpose of having this dental work done was Dr. Alexander's bed-room."

The court sustained the objection and upon this ruling is based the eighty-sixth assignment. This question was then propounded to the defendant: "Now, Mr. White, I will ask you this question: You have stated that just before Dr. Alexander came up into the court-room here, the sheriff's office, with you that you had gone to the academy for the purpose of seeing him there when he came out. What was your purpose in going to see him there at that time, and did you speak to him about the matter that you wanted to speak to him concerning?"

The defendant's counsel then made the following statement: "In response to the question just propounded we proffer to prove by this witness that he went to the academy at that time for the purpose of asking Dr. Alexander about having made an assault upon his wife the morning of the same day, and that he did, as a matter of fact, before parting with Dr. Alexander after the meeting at the schoolhouse ask him about said matter."

The sustaining of an objection to this question forms the basis for the eighty-seventh assignment.

This question was then propounded: "After you had seen Dr. Alexander at the academy, did he or not admit to you that he had on the morning of that same day in his dental office make an assault upon your wife by hugging her and kissing her?"

Counsel for the defendant made the following statement: "In response to the question just propounded we proffer to prove by this witness that at the meeting of the defendant and Dr. Alexander, that Dr. Alexander admitted to him at that time that he had on the morning of that same day, in his dental office in Marianna, hugged and kissed the wife of defendant."

This question was objected to and the objection sustained, which ruling furnishes the predicate for the eighty-eighth assignment.

This question was then propounded: "After Dr. Alexander had left the court-house, and after you had left the court-house, state whether or not there was any understanding between you and any other parties to the effect that they, that is, the other parties, should go and see Dr. Alexander in your behalf and insist that he either leave town or publish his apologies that he had made to you publicly in the Marianna paper"?

Defendant's counsel made the following statement: "We proffer to prove by this witness that he did request Mr. Joe Davis, Mr. Ellis Davis and Jim Lewis, and that he had an understanding with the three named parties, that they would go and see Dr. Alexander and tell him that the defendant, Jim White, insisted and would be satisfied if Dr. Alexander would either leave the town of Marianna, or publish in the Marianna paper publicly the same admission and apology that he had offered him, the defendant orally."

The court sustained the objection interposed to this

question, and this ruling forms the basis for the eighty-ninth assignment.

It is obvious from what I have said, in disposing of preceding assignments, that I do not think that any error was committed in any of these rulings, therefore it becomes unnecessary for me to comment upon these assignments, so I content myself with stating that they have not been sustained.

The ninetieth assignment is as follows: "The court erred in refusing to permit the defendant to prove separately each of the propositions that were proffered to be proven by the witness, Malcolm Stephens, Mrs. J. V. White, W. A. Lewis and Mrs. Lula King, which were proffered to be proven by each of said witnesses prior to the testimony of the defendant, J. V. White, as though each of said questions were propounded to each of said witnesses subsequent to the testimony of the defendant."

It is readily apparent, in view of what I have already said, that this assignment must fail, so I pass it without any discussion.

Next comes the ninety-first assignment, which is as follows: "The court erred in instructing the jury as follows: 'The other point is the question and answer of the defendant, White, the question being, 'What was the remark you made at that time,' and that part of the answer which gave a reason for the action he proposed to take will be excluded from the consideration of the jury, and they are directed and instructed not to consider it in considering the case; this will leave the question,—'What was the remark you made at that time,' and the answer,—'I told Gus Lewis that if he did not leave town to-night, or publish his apology in the paper I would publish him myself to the people in this town and the surrounding country;' the balance of the testimony being stricken from the answer on motion of the State."

In treating the fifty-first, fifty-second and fifty-fourth assignments, all based upon the exclusion of certain testimony proffered by the witness, Gus Lewis, concerning a certain conversation which had taken place between him and the defendant, from ten to twenty minutes before the homicide occurred, in front of Alderman's store, I had occasion to refer to the fact that the defendant himself had also testified as to the remark which he had made to Gus Lewis, as to which the witness Alsobrook had testified on behalf of the State. I further stated in connection that the defendant had denied making the remark attributed to him by Alsobrook, had stated what the remark was which he did make and had further said, "that I thought it was a courtesy I was due to the people of the town for the assault he had made on my wife." The State moved to strike out this last statement, which motion was denied, the court saying that he would instruct the jury concerning it at the proper time. I find that, at the close of all the testimony, just prior to delivering his charge to the jury, the court stated that there were two points of the testimony that he wanted to make a ruling on. He then proceeded to instruct the jury not to consider certain portions of the testimony of George Farley as to certain remarks he heard Dr. Alexander make to his sister, on the night of the homicide, to which I have previously referred in this opinion. The other point was as to this statement of the defendant. It seems hardly necessary to say that it was not admissible testimony for the defendant to state as to what he thought at the time he made the remark to Gus Lewis or his reasons for making it. The court was clearly right in ruling it out and instructing the jury not to consider it, therefore this assignment fails.

The next assignment urged before us is the ninety-seventh which is based upon the giving of the special instruction numbered eight, at the request of the State,.

which is as follows: "When from the evidence the jury is satisfied of the previous existence of malice in the slayer, its continuance down to the perpetration of the homicide, if a homicide was committed, must be presumed unless there is evidence to rebut it and show that the wicked purpose has been abandoned."

It is obvious that this instruction relates to and is applicable to murder in the first degree.

As the defendant was acquitted of this charge by the jury returning a verdict finding him guilty of murder in the second degree, it becomes unnecessary for me to pass upon this assignment. Mathis v. State, 45 Fla., 46, 34 South. Rep., 287, and Vickery v. State, 50 Fla. 144, 38 South. Rep., 907.

The ninety-ninth assignment is based upon the refusal of the court to give the following instruction requested by the defendant: "If you believe from the evidence beyond a reasonable doubt that the defendant shot and killed Alexander, but you have a reasonable doubt as to whether the defendant acted unlawfully, then you will find him not guilty."

As the court had already fully and correctly instructed the jury upon the legal principles embodied in this requested instruction, no error was committed in refusing it. Bass v. State, 58 Fla., 1, 50 South. Rep., 531.

The one hundredth assignment is based upon the refusal to give the following requested instruction: "If you should believe from the evidence, beyond a reasonable doubt, that the defendant unlawfully killed Alexander, but have a reasonable doubt as to whether or not he is guilty of murder in the first degree, murder in the second degree or manslaughter, then, in such event, you should give the defendant the benefit of such reasonable doubt, and find him guilty of manslaughter; but if you should have a reasonable doubt in your mind as to whether or not

the killing of Alexander by the defendant, if he did kill him, was unlawful, then, in such event, you should give the defendant the benefit of such doubt and find him not guilty."

What I have just said, in treating the ninety-ninth assignments, is alike applicable here. Also see Maloy v. State, 52 Fla., 101, 41 South. Rep., 791.

The one hundred and first assignment is based upon the refusal of the court to give the following requested instruction: "If you have a reasonable doubt as to the guilt or innocence of the defendant, whether such doubt arises from evidence that has been submitted to you, or from the lack, want or absence of evidence as to any material fact or facts in this case, you should find the defendant not guilty."

The one hundred and second assignment is based upon the refusal to give this requested instruction: "If, after a fair and careful consideration of the evidence in this case, you should still feel that there was any material fact or facts necessary to establish the guilt of the defendant, unproven by the evidence, or that you had a reasonable doubt in your mind as to whether any material fact or facts necessary to be proved in order to establish the guilt of the defendant had been proven by the evidence beyond a reasonable doubt, then you should find the defendant not guilty."

What I have just said, in disposing of the other refused instructions, upon which error is predicated, applies with full force to these two assignments.

I wish to call attention to the fact that, although the charge given by the court of its own motion was of some length and would seem to have covered pretty fully and fairly all the legal points involved in the trial of this case, and had also given nine instructions, at the instance of the State, the defendant presented thirty separate special in-

structions which he requested the court to give. We have had occasion several times to express our disapproval of requesting an unnecessarily large number of instructions to the jury. See McCall v. State, 55 Fla., 108, 46 South. Rep., 321, and prior decisions of this court there cited. I would also refer to what is said upon this point in Kinney v. City of Springfield, 35 Mo., App., 97.

This brings me to the one hundred and third assignment, which is the last and is based upon the overruling of the motion for a new trial. The only ground thereof urged before us is as to the sufficiency of the evidence to support the verdict. Although this motion contains thirty-three grounds, it has no ground questioning the sufficiency of the evidence to sustain the verdict. This being true, the trial judge was never afforded an opportunity of passing upon this question, therefore I am precluded from considering it. Davis v. State, 47 Fla., 26, 36 South. Rep., 170, and Manatee County State Bank v. B. F. Wade Packing Co., 56 Fla., 492, 47 South. Rep. 927, and other decisions of this court therein cited. Having failed to discover any reversible error, I think that the judgment must be affirmed.