## P. H. SMITHSON *v.* STATE.

### (*Nashville.*   December Term, 1910.)

1. **HOMICIDE.** Rejection of evidence of the lecherous character of the deceased showing motive of accused to protect his young daughter is reversible error.

Where the accused, the father of a motherless daughter, sixteen years of age, knowing that the deceased was a libertine, wrote him a friendly letter, requesting that he cease his attentions to his said daughter, as she was too young to marry; and the deceased replied to the letter in a flippant and offensive note, admitting that he had proposed marriage to the daughter, but denying that he had any intention to marry her, and almost declaring in so many words that his attenions to the daughter were for no good purpose, and, when taken in connection with the prisoner's knowledge of the decedent's character, the reply was of a nature to excite much further the apprehensions of the father concerning the decedent's visits to the young daughter; and with some evidence tending to show that the accused was under the impression that the deceased had not discontinued his meetings with the daughter, but had seen her clandestinely after decedent's said letter; and, thereafter, on the night of the homicide, the accused met the deceased at a social gathering, and upon seeing him in conversation with the daughter, beckoned him to one side, where they had an altercation, and the accused claimed that, after the deceased had struck him with brassknucks, he, in self-defense, shot and killed the deceased. Upon these facts, it was reversible error for the trial judge to reject evidence of decedent's conduct with other women, indicating a lecherous character to a high degree, which was known to the accused, and was admissible as bearing upon the motives of the accused. (*Post, pp.* 220-229.)

Smithson v. State.

Cases cited and approved:    State v. Zellers, 7 N. J. Law, 220, 230; Cheek v. State, 35 Ind., 492; Shepherd v. Commonwealth, 119 Ky., 931; Shipp v. Commonwealth, 124 Ky., 643; Austin v. State, 14 Ark., 561; Pritchett v. State, 22 Ala., 39; Gardom v. Woodard, 44 Kan., 758.

2. **CRIMINAL LAW.  What constitutes the "res gestae" in a prosecution for murder.**

The "res gestae" is the murder, and the murder is made up of the homicide and the intent with which it was committed; and in a prosecution for murder, the *"res gestae"* is not limited to the act of killing, for it includes not only the killing itself, but also the acts and words demonstrating the intention and motive.  (*Post, pp.* 227, 228.)

Cases cited and aproved:    Cornwell v. State, M. & Y., 147; Garber v. State, 4 Cold., 161, 169; Ray v. State, 108 Tenn., 282.

3. **SAME.  Same.  Intent and malice are essential to murder, even in the second degree; motive may rebut presumption of malice raised by other evidence.**

To sustain a conviction for murder, even in the second degree, it is as essential to show the intent, directly or circumstantially, as it is to prove the killing itself; and it was reversible error in the trial judge to exclude the evidence reflecting on the motive and intention of the accused; for it was admissible in this case to explain the motive of the accused in calling the deceased aside at the social gathering, and to rebut the presumption of malice necessary to sustain the conviction for murder in the second degree, which other evidence in the record raised against the accused.  (*Post, pp.* 228, 229.)

FROM WILLIAMSON.

Appeal in error from the Circuit Court of Williamson County.—DOUGLAS WILKE, Judge.

McCorkle, Hearn & Lane and J. C. Eggleston, for Smithson.

Assistant Attorney-General Faw, for State.

Mr. Justice Green delivered the opinion of the Court.

The plaintiff in error was indicted for the killing of one Jesse Jackson. He was convicted of murder in the second degree, and sentenced to the penitentiary for ten years. Motion for a new trial was overruled, and the case was brought to this court.

This killing occurred in Williamson county on July 20, 1906, at an ice cream supper that was held at a country schoolhouse. The facts, so far as necessary to be stated, are these:

The plaintiff in error was a man of about 37 years of age. He had been married twice, and at the time of the killing he was living with his second wife. By his first wife he had a daughter, named Eunice, 16 years of age, who was also living with him at this time.

The deceased, Jesse Jackson, was a man about 27 or 28 years old at the time of the tragedy. He and the plaintiff in error had been somewhat intimate friends for a number of years and were on confidential terms.

Some time prior to his death, Jesse Jackson began to pay attention to Eunice Smithson, referred to above. It seems that the plaintiff in error objected very seriously to these visits to his daughter by Jackson.

Some three months before this killing, Smithson addressed to the deceased a letter, in which he requested Jackson to cease his attentions to the daughter Eunice. Smithson said in the letter that the girl's mother was dead, that he was the only one she had to look after her, that he was informed Jackson had tried to get her to marry him, and that he wanted this pursuit of the girl stopped, as she was too young to marry. Although couched in homely phrase, the letter was courteous and friendly in its language, and the father disclaimed particularly any intention of givng offense.

Jackson replied to this letter in a flippant note, admitting that he had asked the girl to marry him, but disavowed expressly any serious intentions in his addresses to her. His communication was to the effect that he had no thought of marriage, and almost in as many words he declared that his attentions to Eunice were for no good purpose. He concluded his letter with these words: "It looks funny to me that a man can't go to see a girl a half dozen times, but what somebody is ready to say they are going to marry. Of course, I asked Eunice to marry me; but didn't you never ask a girl to marry her, and then not marry her. You didn't think I was going to talk to her about cats and dogs all this time."

This reply of Jackson, as has been seen, was offensive in tone, expressly avowed that the requests to marry were not in good faith, and, taken in connection with Smithson's knowledge of deceased's character, hereafter

referred to, the reply was of a nature to much further excite the apprehensions of the father concerning this man's visits to the young daughter.

There is some evidence tending to show that the plaintiff in error was under the impression that deceased had not discontinued his meetings with Eunice, the daughter, but that they had seen each other clandestinely after Jackson's foregoing letter.

On the night of July 20, 1906, as before indicated, there was a social gathering at a country schoolhouse in Williamson county. Seats were arranged for the young people in a circle, which was lighted by Chinese lanterns, and they were engaged in social conversation and other diversions.

Smithson attended this festival in company with his wife. His daughter, Eunice, was also present, but seems not to have come with her father. When he arrived at the place of gathering, he found his daughter already there. She was seated at one side of this circle, which was called the promenade ring, and Jackson was engaging her in conversation, when the plaintiff in error arrived.

The plaintiff in error, upon seeing his daughter thus engaged with the deceased, beckoned to the latter and called him off to one side out into the woods, a short distance from where the gathering was. After the two had retired to this place, which was only a few feet away from the ring, there they had an altercation which was witnessed by several persons. It amounted only to a

slight fisticuff, however, and attracted no particular at-
tention.

At the conclusion of this encounter the deceased and
plaintiff in error then proceeded some distance from the
place where the company was gathered, going over to a
church which was in the neighborhood. It seems that
they mutually agreed to retire to this farther point, that
they might there settle their differences without inter-
ruption.

According to the testimony of the plaintiff in error,
when he arrived at the latter point, he again remon-
strated with Jackson about the latter's attention to
Eunice. He says that Jackson replied to him with pro-
fane language, and struck him a heavy blow or blows in
the face with brassknucks, whereupon the plaintiff in
error produced his pistol and fired two or three shots at
the deceased. He testified that after these shots were
fired the deceased ran off, and plaintiff in error supposed
the shots had missed entirely. One of the shots, how-
ever, passed probably through the apex of Jackson's
heart, and it is doubtful from the testimony in this
record if he could have done anything more than drop in
his tracks after he was shot. At any rate the plaintiff
in error then returned to the festival, and left there
shortly, going to spend the night with a neighbor.

This tragedy occurred Friday night, and Jackson's
body was discovered on Sunday morning, by a gentle-
man in the neighborhood, lying just at the church where

the difficulty had occurred according to the testimony of the plaintiff in error.

The theory of the plaintiff in error was that he approached Jackson first merely to protest further against the latter's attentions to Eunice, and he says that, when he retired to the church with Jackson, the latter commenced the assault as above indicated, and that he (Smithson) acted in self-defense.

On the trial below, the defendant undertook to testify as to certain conversations he had had with the deceased and as to his knowledge of the deceased's character.

From these conversations it appeared that deceased was an impossible associate for a young girl. He boasted to the plaintiff in error of his conquests of women, prided himself on the numbers of his victims, and named them, accompanied with some detail of his methods. The plaintiff in error offered to relate various statements that Jackson had made to him, indicating that the character of the latter was lecherous to a high degree. The defendant below also sought to prove that on one occasion, prior to the killing, his wife told him she had seen Jackson hugging and kissing the daughter Eunice.

The circuit judge excluded all this evidence. In this we think he was in error.

We have searched this record carefully to find the motive for the conduct of the plaintiff in error. None is apparent, except a natural, tender, and praiseworthy solicitude for the welfare of his motherless daughter, as indicated in the letter heretofore referred to. The plain-

tiff in error felt that the entire responsibility of this girl's future depended on him, her mother being dead. Any evidence tending to show that the plaintiff in error was inspired by a disposition to protect his daughter from a libertine is competent, and should have been allowed to go to the jury as reflecting on his motive in seeking the interview with deceased. It is always proper to offer, in explanation of motive for crime, the state of mind or intentions of the accused; for in the state of his mind lies the difference between murder and manslaughter.

Mr. Wharton says:

"The distinction between murder, either in the first or in the second degree, and manslaughter, is that in murder in either degree malice is a necessary ingredient, and the crime is attributable to a wicked, depraved, and malignant spirit, while in manslaughter malice is wanting and the crime is imputed by the benignity of the law to human infirmity. If malice existed, the crime is murder, and not manslaughter, though sudden passion coexisted, and the homicide was the product of both. And in manslaughter malice is presumed to be and is absent. . . . The distinguishing characteristics of manslaughter are absence of malice or an intent to kill, and action while in the heat of passion, or an intent to kill under provocation sufficiently serious to deprive the intentional killing of its malicious character, though the mere presence or absence of intent to kill is not the test, since there may be an intent to kill under proper provoca-

124 Tenn.—15

tion in manslaughter. . . . And to sustain a verdict of murder in the second degree the proof must show that the homicide was committed with malice aforethought, either express or implied, and that it was not the result of sudden heat upon adequate provocation." Wharton on Homicide, section 163.

In many of the States the conduct or language of the deceased in respect to the female relatives of the accused, when insulting in its nature, may be offered in evidence as affording sufficient provocation to reduce the degree of the homicide, if it be shown that the defendant had knowledge of such insults at the time of the killing. 21 Cyc., 950.

The supreme court of New Jersey has said:

"Inasmuch as the distinction between murder and manslaughter depends upon the impulse of the mind with which the act was committed, every circumstance which goes to show the feeling of the parties toward each other may be proper." *State* v. *Zellers,* 7 N. J. Law, 220, 230.

The supreme court of Indiana has held that evidence that the person killed had entered into a conspiracy with a third party to induce defendant's wife to elope, and that the facts going to prove such conspiracy had lately come to the knowledge of the defendant, is competent. *Cheek* v. *State,* 35 Ind., 492.

The court of appeals of Kentucky, in two late cases, held that it was permissible for the accused to testify as to knowledge, which he had obtained prior to the killing,

as to improper relations existing between the deceased and female relatives of the accused. *Shepherd* v. *Commonwealth*, 119 Ky., 931, 85 S. W., 191; *Shipp* v. *Commonwealth*, 124 Ky., 643, 99 S. W., 945, 10 L. R. A. (N. S.), 335. The court held in these two cases that it was proper to allow this evidence to go to the jury, and for them to say how much such information which the accused had received should palliate his conduct, if at all.

The supreme court of Arkansas has said in discussing evidence of this character:

"The jury was sitting in judgment upon an act which in point of law was to be essentially characterized by the motives of the heart which prompted it. These in the order of Providence are hidden and beyond the reach of human law, until developed by acts of commission which present them to its judgment in determining the quality of the act brought in question. Every act, then, of either class, which in the range of probability could cast a ray of light upon the motive which produced the homicide in question, was legitimately within the range of investigation, although occurring at an antecedent time or at another place." *Austin* v. *State,* 14 Ark., 561.

See, also, *Pritchett* v. *State,* 22 Ala., 39, 58 Am. Dec., 250; *Gardom* v. *Woodard,* 44 Kan., 758, 25 Pac., 199, 21 Am. St. Rep., 310.

This plaintiff in error, as before noted, was convicted of murder in the second degree. This court, in discussing a homicide or murder has said:

"The *res gestae* is the murder, and the murder is made

up of the homicide and the intent with which it was committed. Actions, therefore, which seem to demonstrate the *quo animo* are a part of the *res gestae,* and words which are a part of these actions are admissible." *Garber* v. *State,* 4 Cold., 161, 169.

And again:

"It is a great mistake to suppose that the *res gestae* in the legal sense is in a case of murder confined to the fact of thrusting the knife into the body and thereby depriving of life. The *res gestae* is the murder, and the murder is made up of the homicide and the intent with which it was committed." *Cornwell* v. *State,* Mart. & Y., 147. To the same effect, see *Ray* v. *State,* 108 Tenn., 282, 67 S. W., 553.

So that to sustain a conviction for murder, it is as essential to show the intent, directly or circumstantially, as it is to prove the killing itself. This being true, we think the trial judge was in error in excluding the evidence that we have heretofore referred to. This evidence reflected on the motive and intentions of the plaintiff in error. It was admissible to explain his motive in calling Jackson aside at the ice cream supper. It was admissible to rebut the presumption of malice, necessary to sustain this conviction for murder, which other evidence in the record raised against Smithson.

Manifestly his feelings upon seeing deceased conversing with the daughter were very different from what they would have been had plaintiff in error obtained a different impression of Jackson's character. The

avowals of Jackson as to his habits and propensities, made to the plaintiff in error, of course, fixed the latter's view of deceased's manner of conduct toward women.

The jury could not possibly appreciate this father's attitude and feelings toward Jackson's attentions to the daughter without understanding the father's estimate of Jackson's character. It was proper, therefore, when the jury were to judge these acts of the father, and to consider his state of mind, that they should have been allowed to hear what manner of man the deceased described himself to be in conversing with the man whose daughter he was pursuing.

For the errors stated, the case will be reversed, and remanded for a new trial.