# Richmond.

## Charles W. Parsons v. Commonwealth.

### January 17, 1924.

### Absent, Sims and Burks, JJ.

1. Change of Venue—*Discretion of Trial Court—Case at Bar.*—In the instant case accused's motion for a change of venue was strongly supported by the affidavits of fifteen citizens of the county to the effect that it was impossible for the accused to have a fair trial there, and that, even if a jury could be procured from some other county, they would be so influenced by the local prejudice against the accused as to deny him a fair and impartial trial.

   *Held:* That matters of this sort must generally be referred to the discretion of the trial court, and the Supreme Court of Appeals will not interfere with that discretion unless it has been clearly abused.

2. Change of Venue—*Discretion of Trial Court—Case at Bar.*—The trial court must be allowed a wide discretion in deciding motions for change of venue or for a jury from another county; and, moreover, where the motion is based on the ground that an impartial jury cannot be obtained in the county, the fact that an impartial jury has subsequently been secured therein is conclusive proof that the motion was without foundation. Applying this rule, in the instant case, it was held that an assignment of error upon the refusal of the trial court to sustain the accused's motion for a change of venue was not well taken.

3. Jury—*Opinion of Jurors on Guilt of Accused—Discretion of Court—Case at Bar.*—The cases in Virginia on the subject of the disqualification of a juror who has formed an opinion as to the guilt of the accused cannot be reconciled, and much must be left to the discretion of the trial judge. No inflexible rule can be framed, but certainly the character of the case to be tried should affect the decision. In the instant case, in which the killing of an unarmed man by the accused was unquestioned, and had greatly excited the public, extraordinary care should have been taken to secure a fair and impartial jury to determine the degree of the crime. The Supreme Court of Appeals has gone far to maintain the sanctity of verdicts; but such a sanctity can only be accorded where the talesmen, when they are accepted, have been first shown to be free from legal exception.

4.  Jury—*Opinion of Jurors on Guilt of Accused—Fixed Opinion—Assent of Jurors to Persuasive Suggestion—Case at Bar.*—In the instant case it appeared from the record that several of the panel summoned were rejected by the trial court for reasons which seemed no stronger than the reasons assigned for the rejection of two of the jurors who were accepted. These jurors admitted that they had formed an opinion as to the guilt or innocence of the accused, but stated that they could disregard this opinion and let their deliberations depend upon the evidence heard in the courtroom, and that they could give the prisoner a fair and impartial trial notwithstanding the previously formed opinion.

    *Held:*  That while the jurors might have been competent, if the jurors had upon their own motion declared that they could give the accused a fair trial upon the evidence, notwithstanding their previously formed opinion, yet this was not the case, as the qualifying facts did not emanate from the jurors, but were suggested by the leading, argumentative, and persuasive questions which were addressed to them, to which they assented.

5.  Jury—*Opinion of Jurors on Guilt of Accused—Fixed Opinion—Assent of Jurors to Persuasive Suggestions.*—The Supreme Court of Appeals will go far to sustain the trial judges in their effort to select impartial jurors, because their task is frequently difficult, and exceptions are frequently frivolous. Sometimes it is made more difficult than it otherwise would be because the persons summoned desire to evade jury service. In such instances the conscience of the venireman should be probed, and, if, notwithstanding his previous expressions of opinion based upon common rumor, he is nevertheless fair and unprejudiced, he should be accepted as qualified. The true test, however, lies in the mental attitude of the proposed juror, and the proof that he is impartial and fair should come from him, and not be based on his mere assent to persuasive suggestions.

6.  Jury—*Opinion of Jurors on Guilt of Accused—Fixed Opinion—Suggestive Questions—Particular Case.*—While the selection of jurors who had formed an opinion upon the guilt of accused but who had in answer to suggestive and persuasive questions agreed that they could give the accused a fair trial upon the evidence would not in every case be held to constitute reversible error, yet the instant case was unusual, and, the prisoner having shown the existence of strong local prejudice against him, with which both the jurors accepted seemed to be familiar, there should have been a greater effort to secure jurors who were free from exception, especially as fourteen talesmen of the second venire had not been examined, and were presumably in the courtroom.

7.  Criminal Law—*Homicide—Evidence—Motive—Separate Crimes—Malice of Accused.*—When the prosecution is seeking to show malice on the part of the accused, any fact is admissible against him in evidence

which tends to shed light upon his intention, even though it may tend to prove a separate offense, and in homicide cases the evidence of the words, actions, conduct, and general demeanor of the defendant before the killing, not too remote in time, may for the purpose of .proving his malice be freely introduced.

8. CRIMINAL LAW—*Evidence—Motive—Mental Condition.*—When the fact is material, witnesses are frequently allowed to testify as to their own mental state or the mental state of another person. Of course, such testimony to be competent must be relevant and not too remote in point of time.

9. CRIMINAL LAW—*Evidence—Motive.*—In order to show motive, a wider range of evidence is of necessity permitted than is allowed in support of other issues, becáuse otherwise there would often be no means to discover or disclose secret designs or purposes, which frequently constitute the substance of the offense.

10. CRIMINAL LAW—*Motive—Testimony of Accused and Others as to Motive.*—Since the statutes permitting persons charged with crime to testify, it seems to be held everywhere, except in Alabama, that, in prosecutions for crime, whenever the intent of the accused is relevant to the issue, or whenever his intent in doing the act charged becomes material, he may testify as to his own motive and intent. Of course such testimony is like most other testimony, not conclusive, but worthy of fair consideration by the jury, and it is difficult to perceive any sound reason for denying to an accused person the right to prove by other witnesses any similar favorable facts tending to show his motive or mental condition.

11. HOMICIDE—*Motive—Degree of Crime—Declaration of Deceased Prior to the Crime.*—In the instant case the paramount question was as to the degree of the homicide. The jury had to determine .whether it was murder in the first degree, or a homicide of lesser grade, committed under a reasonable fear of bodily harm, or under some sudden, uncontrollable impulse produced by a paroxysm of fear. Deceased was a striker and there was evidence that the strikers believed accused to be a spy, and that they publicly exhibited their dislike of him. There was evidence of intimidation on the part of the strikers of those they thought to be opposed to them. A witness for accused testified that on the day of the homicide accused told him that he was afraid of deceased. This evidence was excluded by the trial court.

*Held:* Reversible error, as the evidence tended to show defendant's mental attitude of fear, which was clearly material.

12. HOMICIDE—*Evidence—Placard Posted Upon Accused's Door—Case at Bar.*—In a prosecution for murder deceased was a striker and there was evidence of strong feeling of dislike by the strikers against accused. The paramount question in the case was the degree of the homicide, and accused's mental attitude of fear was material

to this issue. Accused offered to prove that a placard containing this language, "The Knights of the Ku Klux Klan" had been found on his office door prior to the homicide, which placard he also de-sired to offer in evidence. The trial court refused to admit the placard.

*Held:* That inasmuch as the record did not show that the accused undertook to fix the date when the placard was affixed to his office door, its exclusion was technically correct. Before excluding it,. however, the court should have ascertaned the date when it was so posted, and, if not too remote, the proffered evidence should have been admitted.

13. HOMICIDE—*Argument of Counsel—Reference to Deceased's Wife and Child.*—On a prosecution for murder the assistant prosecutor referred to the fact that a widow of the deceased and an infant child survived him and were in the courtroom, and stated that the jury should bear this in mind when the counsel for the defendant should appeal to their sympathy in behalf of their client and his wife and children. Upon objection on the part of the accused the trial court stated that in its opinion the remarks were not improper, and declined to direct the jury to disregard the same.

*Held:* That the remarks were improper and the trial court should have directed the jury to disregard them.

14. CRIMINAL LAW—*Argument of Counsel—Argument by Prosecutor—Argument by Attorney for Prisoner—Appeals for Sympathy.*—Whatever liberties are permitted to counsel for persons who are guilty of crime to appeal for mercy for their clients, and to refer to those near and dear to them who will vicariously suffer under such circumstances, the prosecutor has no corresponding liberty. The Commonwealth does not rely either upon prejudice or sympathy for the enforcement of its laws. That every normal human being in case of homicide does sympathize with the widow and children of the deceased is true, but this fact in no way assists in determining either the guilt or the innocence of the accused, and the attention ofth3 jury charged with passing thereon should not be thus distracted.

15. ARGUMENTS OF COUNSEL—*Irrelevant Facts.*—Facts which cannot be proved because irrelevant can afford no proper basis for argument.

16. HOMICIDE—*Instructions—Murder—Murder in the First and Second Degree.*—In Virginia, murder in the first degree and murder in the second degree are distinguished, and while the trial court in an instruction, by the use of the word "murder," doubtless intended to include both degrees of murder, it cannot be assumed that jurors, who had no legal training, would always bear this distinction in mind. If in the instruction in question the word "murder" was construed to refer solely to murder in the first degree, then the instruction would have been erroneous. If construed to refer to both murder in the first degree and murder in the second degree, it was obscure. Therefore, in the form given, the instruction was misleading and erroneous.

17.  CRIMINAL LAW—*New Trial—Final Judgment by Appellate Court—Change in Law Suggested.*—"The rapid increase in criminal business and the growing inability of the courts to dispatch it suggests the need for greater expedition.  We are told that in England the appellate court, when error is found, need not remand the case for a new trial, but is empowered either to increase or decrease the sentence and dispose of the case finally.  If such a power were accorded to this court it would not only tend to discourage appeals by the guilty when based upon mere errors of procedure, but would also afford a simple and expeditious method of correcting sentences which are either too light or too severe, and thus avoid the delay, expense, and uncertainties of new trials.  Such a change is worthy of consideration."

Error to a judgment of the Circuit Court of Northampton county.

*Reversed.*

The opinion states the case.

*John L. Lee, James E. Heath* and *S. James Turlington,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

The accused has been convicted of murder in the first degree and sentenced to confinement for life in the State Penitentiary.

During the nation-wide strike of railway employees in 1922, he killed George R. Lewis, a native of Northampton county and a resident of Cape Charles, who was one of the strikers, under circumstances which naturally aroused a very strong local prejudice against him on account of his offense.  He is here seeking a reversal of the judgment, and assigns a number of errors.

1.  The first assignment of error is based upon the re-

fusal of the trial court to sustain the petitioner's motion for a change of venue. This motion is supported by the affidavits of fifteen citizens of the county, to the effect that it was impossible for the accused to have a fair trial there, and that even if a jury could be procured from some other county, they would be so influenced by the prejudice against the accused as to deny him a fair and impartial trial. For the Commonwealth, in opposition to this motion, there was testimony that there could be a fair trial in that county, but even these witnesses admitted the existence of local prejudice against the accused.

[1, 2] The motion is strongly supported, but matters of this sort must be generally referred to the discretion of the trial judge, and this court will not interfere with that discretion unless it has been clearly abused.

The rule is thus recently stated in *Taylor* v. *Commonwealth*, 122 Va. 889, 94 S. E. 795, 796: "This court has repeatedly held, and it is the established rule in Virginia, that the trial court must be allowed a wide discretion in deciding motions for change of venue, or for a jury from another county; and, moreover, that where the motion is based on the ground that an impartial jury cannot be obtained in the county, the fact that an impartial jury has subsequently been secured therein is conclusive proof that the motion was without foundation."

[3-5] Applying this rule, we hold that this assignment is not well taken.

2. The basis of another assignment of error is the acceptance of Walter M. Hurt and Charles B. James on the panel of twenty held to be free from exception, from which the jurors were selected.

The cases on this subject in Virginia, as was said by Keith, P., in *McCue* v. *Commonwealth*, 103 Va. 988, 49

S. E. 625, cannot be reconciled, and much must be left to the discretion of the trial judge. The question has been recently reviewed in *Rust* v. *Reid*, 124 Va. 17, 97 S. E. 324. No inflexible rule can be framed, but certainly the character of the case to be tried should affect the decision. In this case, in which the killing of an unarmed man by the accused was unquestioned, and had so excited the public, extraordinary care should have been taken to secure a fair and impartial jury to determine the degree of the crime. This court in obedience to the statute, which accords with its own view of sound public policy, has gone far to maintain the sanctity of verdicts; but such a sanctity can only be accorded where the talesmen, when they are accepted in the particular case, have been first shown to be free from legal exception.

The record shows that several of the panel summoned were rejected by the trial court for reasons which seem to us no stronger than the reasons here assigned for rejection of the two just referred to.

This is the pertinent part of the examination of Hurt upon his *voir dire:*

"Q. Have you heard or read what purported to be a statement of the facts and circumstances attendant upon the homicide in question?

"A. Yes, sir.

"Q. Have you heard any such account from one who claimed to have been an eye witness to the killing?

"A. No, sir.

"Q. You have merely heard it and read of it as the average citizen has read the startling event that has occurred in your community?

"A. Yes, sir; that is all.

"Q. From what you have read or heard with reference to the matter, have you formed or expressed, or do

you now entertain any opinion as to the guilt or innocence of the accused?

"A. Yes, sir; I have an opinion.

"Q. Mr. Hurt, would that opinion govern you or influence you in your deliberation if you were chosen on this jury?

"A. No, sir; not with different evidence.

"Q. That opinion would not influence you?

"A. No, sir; it would not.

"Q. Then you think if selected and sworn as a juror in this case, that you could try this case in utter disregard of any previous information or opinion of yours, and base your action solely upon the evidence, do you?

"A. Yes, sir; it is no reason why I shouldn't.

"Q. Then that opinion is not such a fixed and substantial and determined one that would take evidence to remove?

"A. No, sir."

Upon cross-examination, this appears:

"Q. You say you have formed an opinion?

"A. Yes, sir.

"Q. Have you also expressed that opinion?

"A. I don't think so.

"Q. Is that opinion fixed and abiding with you now?

"A. Yes, sir; under the evidence that I have heard.

"Q. Then you have a fixed and abiding opinion?

"A. Yes, sir.

"Q. If you were to go upon this jury you would carry to the jury box that opinion?

"A. I would carry it before new evidence.

"Q. You would carry that opinion in your mind just as it is now?

"A. Until I heard other evidence.

"Q. In other words, if you were taken upon this jury you would go upon the jury with that opinion in your mind?

"A. Yes, sir.

"Q. And it would require evidence to change your opinion?

"A. Yes, sir.

"Q. Is it so fixed in your mind now that it would require testimony to remove that opinion from your mind?

"A. Yes, sir.

"Q. So to the extent that you have that opinion you would go upon the jury biased by evidence?

"A. Yes, sir."

The talesman being then challenged, the court pursued the examination thus:

"Q. The court wishes, in your answers to these questions, to impress upon you that this is a serious and far-reaching matter of importance to you, to the Commonwealth and to the prisoner. The court understood you, Mr. Juror, that the opinion you had formed and which you now entertain was hypothetical; in other words, it was based upon the alleged facts that you had heard?

"A. Yes, sir.

"Q. But that would in no wise interfere with you when you come to hear the actual evidence as to the actual facts as detailed by the witnesses on the stand?

"A. Yes, sir.

"Q. Then do you feel, Mr. Hurt, that notwithstanding the opinion you have formed—you say you have not expressed it—do you feel that notwithstanding that, that you can enter upon this service as a juror in this most important case and disregard the opinion you have formed, but let your deliberations and your actions hinge and depend upon the evidence that you hear on the stand?

"A. Yes, sir; I feel that I could.

"Q. You feel that you could give the prisoner a fair and impartial trial, notwithstanding the opinion you have formed?

"A. Yes, sir."

If this talesman, out of his own consciousness and appreciation of the inquiry, had said affirmatively that the opinion which he had previously formed was hypothetical, being only based upon alleged facts, and that it would in no wise interfere with him when he came to hear the evidence from the witnesses as to the actual facts, and that he felt, notwithstanding his opinion, that he could enter upon the service as a juror and disregard his previous opinion and let his deliberations depend upon the evidence heard in the court room, and that he felt he could give the prisoner a fair and impartial trial notwithstanding the opinion he had previously formed, then he would have been a competent juror. It is observed, however, that these qualifying facts did not emanate from him, but were suggested by the leading, argumentative and persuasive questions which were addressed to him. All that he did was to assent thereto. We will go far to sustain the trial judges in their effort to select impartical jurors, because their task is frequently difficult, and exceptions are frequently frivolous. Sometimes it is made more difficult than it otherwise would be because the persons summoned desire to evade jury service. In such instances the conscience of the venireman should be probed, and if notwithstanding his previous expressions of opinion based upon common rumor, he is nevertheless fair and unprejudiced, he should be accepted as qualified. The true test, however, lies in the mental attitude of the proposed juror, and the proof that he is impartial and fair, should come from him and not be based on his mere assent to persuasive suggestions.

The examination of the other talesman, James, is quite similar. He had both formed an opinion and expressed it, and said he would go into the box in such a frame of mind that it would require evidence to change that opinion.

[6] We do not mean to say that the selection of jurors such as these would in every case be held by us to constitute reversible error. As we have indicated, however, this was an unusual case, and the prisoner having shown the existence of strong local prejudice against him, with which both Hurt and James seemed to be familiar, there should have been a greater effort to secure jurors who were free from exception. Fourteen talesmen of the second venire had not been examined, and they presumably were in the court room. There is little reason to doubt that from these the necessary panel of twenty could have been easily secured.

3. Another exception is based upon the exclusion of certain testimony. The witness, Taylor, had testified that on July 1, 1922, he had overheard a conversation between the defendant, Charles W. Parsons, and the deceased, George R. Lewis, in which the latter had warned the defendant not to have anything to do with the railroad strike which had been inaugurated on that day. This question was then asked him: "Did you have any conversation thereafter with Mr. Parsons with reference to this conversation which Mr. Lewis had with him?" The prosecuting attorney objected to the question and any answer that might be made thereto, and the jury were excluded in order that the court might pass upon the objection. The witness then answered "Yes" to the question, and then this fol'owed: "When and where was that conversation?

"A. It was the same day that the tragedy happened, by Mr. Ernest Burton's store door on Pine street.

"Q. In Cape Charles?

"A. Yes, sir; I was on the wagon delivering ice.

"Q. What part of the day was it?

"A. Ten o'clock in the morning that I met Mr. Parsons, and I was asking him about renting a house of him, and as I left Mr. Parsons I turned around to him and I said: 'George Lewis hasn't beat you yet, has he?' and he said: 'No, but don't you know I am afraid of that man, Tom.'

"Q. Did Mr. Parsons accompany that with any action of his head?

"A. Yes, sir; he pulled his hands over his eyes like that; it is a great habit of his; I have seen him do it a thousand times I am satisfied."

[7, 8] The court then sustained the objection to this testimony and refused to allow it to go to the jury. This raises the most serious question, from a legal point of view, which appears in the record. It is one about which courts have disagreed. It is, however, universally held that when the prosecution is seeking to show malice on the part of the accused, any fact is admissible against him in evidence which tends to shed light upon the intention of a defendant charged with the commission of a crime for which he is upon trial, even though it may tend to prove a separate offense, and that in homicide cases the evidence of the words, actions, conduct and general demeanor of the defendant before the killing, not too remote in time, may be the purpose of proving his malice, be freely introduced. This, of course, grows out of the fact that there are inherent difficulties in establishing the existence of a particular state of mind, or of treating mental operations. Because of this, when the fact is material, witnesses are frequently allowed to testify as to their own mental state or the mental state of another person. Of course, such testi-

mony to be competent must be relevant and not too remote in point of time.    22 Corpus Juris 174.

[9] In order to show motive, a wider range of evidence is of necessity permitted than is allowed in support of other issues, because otherwise there would often be no means to discover or disclose secret designs or purposes, which frequently constitute the substance of the offense. 8 R. C. L., section 174, page 182; *Hampton* v. *State*, 7 Okl. Cr. Rep. 291, 123 Pac. 571, 40 L. R. A. (N. S.) 43.

The underlying principle is thus stated in *Commonwealth* v. *Abbott*, 130 Mass. 472: "The existence of a criminal motive is an element which it is often necessary to establish in order to give character to the acts and conduct of a party charged with or suspected of crime.    In such case, the conduct or declarations of a party, both before and after the principal fact in issue, are admissible, provided they are sufficiently near in point of time, and sufficiently significant of the motive or intent to be proved.    The rules which govern human conduct are to be reasonably applied in these cases, as in all other investigations of fact.    They are to be so applied in all cases where the inquiry is as to the mental or moral condition of a person at the time a particular act was done.    The intent or disposition, when it constitutes an element of crime, can only be ascertained, as all moral questions are, from the acts and declarations of the party."

In that case the facts indicating the state of mind of the accused occurred several years before the homicide, and the evidence was excluded, but evidence of a similar character was held to be not too remote and therefore admissible in *Commonwealth* v. *Trefethen*, 157 Mass. 180, 31 N. E. 961, 24 L. R. A. 235. It is there said that "when evidence of the declarations of a person is introduced solely for the purpose of showing what the state

of mind or intention of that person was at the time the declarations were made, the declarations are to be regarded as acts from which the state of mind or intention may be inferred in the same manner as from the appearance of the person or his behavior, or his actions generally."

In *White* v. *State*, 59 Fla. 53, 52 So. 805, this is held: "Where a homicide is shown, and an issue of self-defense is made, evidence of the accused is admissible as to the fact of a hostile meeting between the defendant and the deceased shortly before the fatal encounter, and also of a conversation indicating the apparent feeling of the parties towards each other when they separated, since such circumstances may tend to show the probable attitude of friendliness or hostility of each towards the other when the fatal meeting occurred."

[10] Since the statutes permitting persons charged with crime to testify, it seems to be held everywhere, except in Alabama, that in prosecutions for crime, whenever the intent of the accused is relevant to the issue, or whenever his intent in doing the act charged becomes material, he may testify as to his own motive and intent. Of course such testimony is like most other testimony, not conclusive, but worthy of fair consideration by the jury. 2 Whart. Cr. Ev. (10th ed.) sec. 905.

It is difficult then to perceive any sound reason for denying to an accused person the right to prove by other witnesses any similar favorable facts tending to show his motive or mental condition.

The precise question here involved was decided in *Nelson* v. *State* (Tex. Cr. App.), 58 S. W. 107. There the accused was being tried for murder, and offered to show that after a previous difficulty with the deceased he applied to have him placed under peace bonds, and later applied to the city marshal for protection, stating,

with tears, that deceased would kill him if he went back to his work; that the marshal told him to go to his work, and that after supper he would come around and protect him. The defendant showed that while he was at his work in the back room, deceased came into the front room, and after a few words left the place, and offered to show further that he told his employer that deceased was looking for him to kill him, and that his employer ordered him out of the place, and that he left immediately. It was there held that the evidence should have been received, as showing defendant's intentions, his desire for peace, and apprehension of danger.

So also in *Poole* v. *State,* 45 Tex. Cr. Rep. 363, 76 S. W. 568. The evidence objected to by the State there was that the accused met the defendant at a saloon about an hour or two before the homicide; that he, with two others, was talking and drinking; that he was told by a witness that he had heard the deceased threaten him that morning; that directly afterwards they started down the street and the witness asked the accused if he was not coming too. In this connection the accused proposed to prove that he stated to this witness at the time that he did not want to get cooped up in one of those saloons by the deceased and his crowd. The objection to the testimony was upon the ground that it was self-serving, the court sustained it, and this was held to be error, the court in this connection saying: "While this was a declaration of defendant, it was anterior to the difficulty, and was a fact tending to show his then condition of mind and his apprehension of the difficulty with deceased. We believe that it should have gone to the jury for what it was worth, as tending to shed light on appellant's frame of mind as to deceased at the time of the difficulty and killing, which occurred an hour or two thereafter."

In *Cole* v. *State*, 48 Tex. Cr. Rep. 439, 88 S. W. 342, the case last cited was followed, upon the ground that such statements by an accused person tend to show a condition of the mind of the accused and lack of malice aforethought.

Another recent case is *Commonwealth* v. *Principatti*, 260 Pa. 587, 104 Atl. 53. The accused, who was charged with homicide, was there permitted to show alleged threats of the deceased to kill him, which were made nine days before the killing, in order to show his state of mind at the time of the homicide, and the opinion quotes this from *Commonwealth* v. *Colandro*, 231 Pa. 343, 352, 80 Atl. 571, 574: "The dividing line between self-defense and this character of manslaughter (voluntary, brought about through the influence of a passion of fear) seems to be the existence, as the moving force, of a reasonably founded belief of either imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as existing, but not reasonably justified by the immediate circumstances. If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save one's self from such danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense. * * * while, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter."

In *Smithson* v. *State*, 124 Tenn. 218, 224, 137 S. W. 487, 489, 36 L. R. A. (N. S.) 400, we find this: "We have searched this record carefully to find the motive for the conduct of the plaintiff in error. None is ap-

parent, except a natural, tender, and praiseworthy solici-
tude for the welfare of his motherless daughter, as in-
dicated in the letter heretofore referred to. The plaintiff
in error felt that the entire responsibility of this girl's
future depended on him, her mother being dead. Any
evidence tending to show that the plaintiff in error was
inspired by a disposition to protect his daughter from a
libertine is competent, and should have been allowed to
go to the jury as reflecting his motive in seeking the in-
terview with deceased. It is always proper to offer, in
explanation of motive for crime, the state of mind or
intentions of the accused; for in the state of his mind
lies the difference between murder and manslaughter.''

This from the *Answer of the Judges* to the House of
Lords, concerning Fox's libel act, 31 Geo. III, ch. 60,
22 How. St. Trials, 300, is pertinent: ''Your lordships'
fourth question is, 'Is a witness produced before a jury
in a trial as above, by the plaintiff, for the purpose of
proving the criminal intentions of the writer, or by the
defendant, to rebut the imputation, admissible to be
heard as a competent witness in such trial before the
jury?'. * * * (Assuming that the criminal intent
is material and allowable to be proved or denied at all,
then) cases may be put where a witness is competent
and admissible to prove the criminal intention, on the
part of the prosecutor; and it may be stated as a general
rule, that in all cases where a witness is competent and
admissible to prove the criminal intention, a witness will
also be competent to rebut the imputation.'' While the
cases are few, their logic is unanswerable. Wigmore,
that master of the subject, adheres fully to this view.
With trenchant phrase, apt illustration and sound
reason, he thus expresses himself:

''To hold that every expression of hatred, malice, and
bravado is to be received, while no expression of fear,

good-will, friendship, or the like, can be considered, is to exhibit ourselves the victims of a narrow whimsicality, which might be expected in the tribunal of a Jeffreys, going down from London to Taunton with his list of intended victims already in his pocket, or on a bench 'condemning to order,' as Zola said of Dreyfus' military judges. But it was not to have been anticipated in a legal system which makes so showy a parade of the presumption of innocence and the rights of the accused. This question-begging fallacy about 'making evidence for himself' runs through much of the judicial treatment. There is no reason why a declaration of an existing state of mind, if it would be admissible against the accused, should not also be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive." 3 Wigmore on Evidence (2d ed.), section 1732, page 714.

[11] Applying these precedents to the case in hand, it seems to us clear that the excluded evidence was competent. There is no indication that at the time of the alleged conversation there was danger of any such homicide, or that it was in mind. It does, however, tend to show the mental attitude of the accused and sustain his claim that he was afraid of the deceased. Its truth and weight were to be determined by the jury, considered in connection with the other evidence in the case showing the series of events which unfortunately followed this strike. Whether the leaders of the strike were directly responsible for the lawlessness and terrorism here shown is immaterial. The record discloses many occurrances showing a vindictive spirit, such as threats and breaches of the peace which tended to intimidate all who did not co-operate or sympathize with the strikers. While there is no evidence in the record to show that the accused was in fact antagonistic to the strikers,

or to the deceased as one of them, it is full of evidence showing that the strikers generally believed that he was a spy; that they publicly exhibited their dislike to him; and that he had been grossly, outrageously and inexcusably insulted and ordered off of the streets by a striker a short while before the tragedy.

The killing with a pistol is proved. This, however, was not carried on his person, but was taken from his automobile close by just before it was used. The paramount question in the case is as to the degree of the homicide. The jury had to determine whether it was murder in the first degree—that is, a wilful, deliberate and premeditated killing, or a homicide of lesser grade, committed under a reasonable fear of bodily harm, or under some sudden uncontrollable impulse produced by a paroxysm of fear, created by the circumstances upon which the accused relies for his defense. This being true, his mental attitude of fear, whether based upon sufficient or insufficient reason, is clearly material. The excluded evidence tended to show this state of mind. Our judgment is that it was manifestly pertinent and that its exclusion, upon the motion of the Commonwealth, constitutes reversible error.

[12] 4. The accused offered to prove that a placard containing this language, "The Knights of the Ku Klux Klan," had been found on his office door prior to the homicide, which placard he also desired to offer in evidence. The court sustained the objection thereto and refused to admit it.

We think that if this placard had been posted at any time between the beginning of the strike, July 1, and August 16, the date of the homicide, the evidence would have been admissible. Inasmuch as the record does not show that the accused undertook to fix the date, its exclusion was technically correct. Before excluding it,

.however, the court should have ascertained the date when it was so posted, and if not too remote the proffered evidence should have been admitted.   As we have shown, a vital question in this case, in order to determine the degree of the crime, is the state of mind of the accused, and it is unnecessary to say more as to this placard than that if posted at the office door of the accused, whether those responsible therefor intended it as a pleasantry or as a threat, that fact was worthy of consideration by the jury in order to determine the questions presented to them.

The organization referred to is by some believed to constitute an "invisible empire" of great power, organized for the purpose of enforcing their discipline upon all who differ with them in opinion, or whose conduct excites their criticism.   Whether this opinion of those not admitted to the mysteries of the order be true or false, the sentiment exists, and many outrages have been attributed to those wearing its ghostly uniform. Whatever the purpose of the placard, the jury should have been given the opportunity to consider it, unless too remote in point of time.

[13] 5. Another objection arises out of these circumstances:   The attorney for the Commonwealth was assisted in the prosecution by another attorney, and during his argument this assistant prosecutor referred to the fact that a widow of the deceased, George R. Lewis, and an infant child survived him and were in the court room, and stated that the jury should bear this in mind when the counsel for the defendant should appeal to their sympathy in behalf of their client and his wife and children.   Immediately thereupon the attorneys for the accused stated to the court that they regarded such remarks from one associated with the attorney for the Commonwealth as prejudicial to the defendant, and in

every way improper, and asked the court to direct the jury to disregard the same. The court, however, stated that in its opinion the said remarks were not improper, and declined to direct the jury to disregard the same.

[14, 15] We cannot agree with the learned trial judge, either that the remarks were not improper, or that he should not have directed the jury to disregard them. Whatever liberties are permitted to counsel for persons who are guilty of crime, to appeal for mercy for their clients (though there is no evidence of any such appeal in this record), and to refer to those near and dear to them who will vicariously suffer under such circumstances, the prosecutor has no corresponding liberty. The Commonwealth does not rely either upon prejudice or sympathy for the enforcement of its laws. That every normal human being does sympathize with the widow and children of the deceased is true, but this fact in no way assists in determining either the guilt or the innocence of the accused, and the attention of the jury charged with passing thereon should not be thus distracted. The court should have corrected this inadvertence of the assistant prosecutor. Facts which cannot be proved because irrelevant can afford no proper basis for argument. 30 C. J. 177, section 400.

[16] 6. There is much criticism of the instructions given for the Commonwealth. While we do not mean to approve the precise language of all that were given, we think it necessary to refer only to instruction No. 5, which reads thus:

"The court instructs the jury that, if a killing is done with a deadly weapon, the provocation required by law to reduce the grade of homicide below murder must be great, involving personal violence to the accused or an intent to do him serious bodily harm manifested by some overt and hostile act on the part of the deceased,

or others, if any, cooperating with him at the time, such as would put the accused in reasonable fear of immediate danger to his life or of serious bodily harm; and that mere words, however insulting or irritating they may be by reason of their abusive, contemptuous, or indecent character, do not constitute in the law adequate provocation for such passion or heat of blood as will reduce an intentional homicide, or a voluntary killing with a deadly weapon, below the grade of murder."

In this State we distinguish between murder in the first degree and murder in the second degree, and while this instruction, by the use of the word "murder" doubtless intended to include both degrees of murder, it should not be assumed that the jurors, who had no legal training, would always bear this distinction in mind. If construed to refer solely to murder in the first degree, then the instruction is erroneous. If otherwise construed it is obscure. The evidence introduced by the Commonwealth here (if the evidence for the accused is discredited) would certainly support a conviction of murder in the second degree or voluntary manslaughter; but this cannot be so confidently said of the conviction of murder in the first degree, which depends upon whether the homicide was wilful, deliberate and premeditated. We have no doubt that in the form given, as applied to the facts in this case, this instruction was misleading and therefore erroneous.

We do not feel that any good purpose would be served by a further discussion of the instructions. While it may be difficult in particular cases to apply the law of homicide because of varying circumstances, we believe that it is sufficiently well settled to require little further dissertation from the courts. This is an unusual case. The evidence introduced for the accused tended to show by a number of circumstances that he was in a state of

mental excitement and fear, caused by the openly expressed antipathy of the strikers. He was grossly insulted by one of them a very short time before the homicide. Immediately before the occurrence, when he was in front of his own office on a public street, the charge that he was a spy was repeated by the deceased, and the presence there of twelve of the strikers who were eyewitnesses of the killing was certainly not tranquilizing. This court always hesitates to disturb the verdict of a jury, but, for the reasons which we have indicated, our conclusion is that the accused has been denied some of his substantial rights, and, therefore, that the verdict should be set aside, and the case remanded for a new trial according to law.

[17] The rapid increase in criminal business and the growing inability of the courts to dispatch it suggests the need for greater expedition. We are told that in England the appellate court, when error is found, need not remand the case for a new trial, but is empowered either to increase or decrease the sentence and dispose of the case finally. If such a power were accorded to this court it would not only tend to discourage appeals by the guilty when based upon mere errors of procedure, but would also afford a simple and expeditious method of correcting sentences which are either too light or too severe, and thus avoid the delay, expense and uncertainties of new trials. Such a change is worthy of consideration.

*Reversed.*